52 A.3d 1087

**MASON–DIXON RESORTS, L.P., Appellant**

v.

**PENNSYLVANIA GAMING CONTROL BOARD, Appellee**

v.

**Woodlands Fayette, LLC, Intervenor.**

Supreme Court of Pennsylvania.

Argued March 7, 2012.

Decided Aug. 20, 2012.

Stephen David Schrier, Blank Rome LLP, Philadelphia, for Mason–Dixon Resorts, L.P.

David Cornelius Hittinger Jr., Linda S. Lloyd, Cyrus Raphael Pitre, Richard Douglas Sherman, for Pennsylvania Gaming Control Board.

Adrian Renz King Jr., Raymond Adam Quaglia, Ballard Spahr Andrews & Ingersoll, L.L.P., Philadelphia, Tami Bogutz Steinberg, Flaster/Greenberg, P.C., Cherry Hill, NJ, for Woodlands Fayette, LLC.

Michael D. Sklar, John M. Donnelly, Levine, Staller, Sklar, Chan, Brown & Donnelly, P.A., Atlantic City, NJ, for Penn Harris Gaming, L.P.

Marie J. Jones, Fox Rothschild, L.L.P., Atlantic City, NJ, for Bushkill Group, Inc.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

### OPINION

Chief Justice CASTILLE.

This is a direct appeal filed by Mason–Dixon Resorts, L.P. ("appellant"), from the decision of the Pennsylvania Gaming Control Board (the "Board") which awarded a Category 3 slot machine license to Intervenor Woodlands Fayette, L.L.C. ("Woodlands"). We affirm.

### *Background*

In July 2004, the General Assembly enacted the Pennsylvania Race Horse Development and Gaming Act (the "Act"), 4 Pa.C.S. §§ 1101–1904. The Act provides, *inter alia,* a statutory framework for legalized slot machine gaming at a limited number of licensed facilities throughout the Commonwealth. "Three categories of slot machine gaming facilities are authorized under the Act. 4 Pa.C.S. § 1301. A Category 1 license authorizes the placement and operation of slot machines at existing horse racing tracks; a Category 2 license authorizes the placement and operation of slot machines in standalone facilities; and a Category 3 license authorizes the placement and operation of slot machines in resort hotels. 4 Pa.C.S. §§ 1302–1305." *Station Square Gaming L.P. v. Pa. Gaming Control Bd.,* 592 Pa. 664, 927 A.2d 232, 236 (2007) (*"Station Square "*).

The criteria for the award of a Category 3 slot machine license are set forth in Section 1305 of the Act. Specifically at issue here are the requirements of Section 1305(a)(1):

(a) **Eligibility.**—

(1) A person may be eligible to apply for a Category 3 slot machine license if the applicant, its affiliate, intermediary, subsidiary or holding company has not applied for or been approved or issued a Category 1 or Category 2 slot machine license and the person is seeking to locate a Category 3 licensed facility in a well-established resort hotel having no fewer than 275 guest rooms under common ownership and having substantial year-round recreational guest amenities. The applicant for a Category 3 license shall be the owner or

be a wholly owned subsidiary of the owner of the well-established resort hotel. . . .

4 Pa.C.S. § 1305(a)(1). To qualify as a "well-established resort hotel with substantial year-round recreational guest amenities," the facility must offer "a complement of amenities characteristic of a well-established resort hotel, including but not limited to" the following:

(1) Sports and recreational activities and facilities such as a golf course or golf driving range.

(2) Tennis courts.

(3) Swimming pools or a water park.

(4) A health spa.

(5) Meeting and banquet facilities.

(6) Entertainment facilities.

(7) Restaurant facilities.

(8) Downhill or cross-country skiing facilities.

(9) Bowling lanes.

(10) Movie theaters.

58 Pa.Code § 441a.23(a). Additional criteria for the Board's consideration in granting a slot machine license are listed in the Act, including: restrictions regarding the good character of applicants, and requiring letters of reference from law enforcement entities (4 Pa.C.S. § 1310); business restrictions on who may own, control or hold key positions for a licensed facility (4 Pa.C.S. § 1311); and strict financial fitness requirements to ensure operational viability of the proposed facility (4 Pa.C.S. § 1313).

In addition to the other eligibility requirements of the Act, the Board "may also take into account the following factors when considering" a slot machine license application:

(1) The location and quality of the proposed facility, including, but not limited to, road and transit access, parking and centrality to market service area.

(2) The potential for new job creation and economic development which will result from granting a license to an applicant.

(3) The applicant's good faith plan to recruit, train and upgrade diversity in all employment classifications in the facility.

(4) The applicant's good faith plan for enhancing the representation of diverse groups in the operation of its facility through the ownership and operation of business enterprises associated with or utilized by its facility or through the provision of goods or services utilized by its facility and through the participation in the ownership of the applicant.

(5) The applicant's good faith effort to assure that all persons are accorded equality of opportunity in employment and contracting by it and any contractors, subcontractors, assignees, lessees, agents, vendors and suppliers it may employ directly or indirectly.

(6) The history and success of the applicant in developing tourism facilities ancillary to gaming development if applicable to the applicant.

(7) The degree to which the applicant presents a plan for the project which will likely lead to the creation of quality, living-wage jobs and full-time permanent jobs for residents of this Commonwealth generally and for residents of the host political subdivision in particular.

(8) The record of the applicant and its developer in meeting commitments to local agencies, community-based organizations and employees in other locations.

(9) The degree to which potential adverse effects which might result from the project, including costs of meeting the increased demand for public health care, child care, public transportation, affordable housing and social services, will be mitigated.

(10) The record of the applicant and its developer regarding compliance with:

(i) Federal, State and local discrimination, wage and hour, disability and occupational and environmental health and safety laws; and

(ii) State and local labor relations and employment laws.

(11) The applicant's record in dealing with its employees and their representatives at other locations.

4 Pa.C.S. § 1325(c).

Appellant Mason–Dixon was one of four applicants for the single available Category 3 slot machine license at issue here.[1] Appellant proposed to operate a gaming facility at the Eisenhower Hotel in Adams County. The other applicants for this license were intervenor Woodlands, with a facility at the Nemacolin Woodlands Resort in Fayette County,[2] Penn Harris Gaming, L.P., with a facility to be located in Cumberland County, and Bushkill Group, Inc., with a proposed facility to be located in Monroe County. All four applicants submitted applications regarding their proposed gaming facilities to the Board between June 2007 and April 2010. The Board, together with its Bureau of Licensing ("BOL") and its Bureau of Investigations and Enforcement ("BIE"), conducted an extensive review of the applicants, their principals, and their proposed facilities, and also held public hearings regarding all four applications. The Board heard testimony from witnesses presented by the applicants, reviewed a voluminous documentary record, and also received 35,523 written comments from members of the public, in support of, or in opposition to, the various applications.

1. Prior to its decision to award a license to Woodlands in this case, the Board had granted the only other available Category 3 slot machine license to Valley Forge Convention Center Partners, L.P., and that award was affirmed by this Court. *Greenwood Gaming & Entertainment, Inc. v. Pa. Gaming Control Bd.*, 609 Pa. 368, 15 A.3d 884 (2011).

2. The following principals of Woodlands submitted applications for licensure in conjunction with the Woodlands application:
 - Nemacolin Woodlands, Inc., 100% Owner of Woodlands Fayette L.L.C.
 - 2001 Irrevocable Trust for Margaret H. Magerko, 100% Owner of Nemacolin Woodlands, Inc.
 - Margaret Ann Magerko, President of Woodlands, Sole Trustee and Beneficiary for the 2001 Irrevocable Trust for Margaret H. Magerko
 - Peter J. Magerko, Vice President of Woodlands
 - Cheri Lee Bomar, Secretary and Corporate Counsel for Woodlands
 - Joseph Alexander Hardy, III, Grantor of the 2001 Irrevocable Trust of Margaret H. Magerko.
 Order dated May 20, 2011.

Ultimately, on April 14, 2011, the Board awarded the slots license to Woodlands in a 6–1 vote. The Board explained its process and decision in a 106–page Order and Adjudication dated May 20, 2011, which included extensive findings of fact regarding all four applicants. The Board summarized its conclusions as follows:

Upon reviewing all of the factors in the Act, a qualified majority of the Board finds that, in its opinion, Woodlands should be awarded a license because it possesses the finest well-established resort hotel out of all the applicants and is best positioned to benefit from the addition of a Category 3 licensed facility. Because the Board chooses and approves Woodlands as its first choice for a Category 3 license, the applications of Bushkill, Mason–Dixon, and Penn Harris must be denied, as only one (1) license is currently available. Based upon the findings of fact, conclusions of law and discussions set forth above, which are supported by the evidentiary record, the [Board] finds that Woodlands has satisfied the requirements of 4 Pa.C.S. § 1305 for receipt of a Category 3 license, is eligible and suitable to receive a license, and that it is in the best interest of the public and the Commonwealth that this entity be granted the available Category 3 slot machine license allocated by the General Assembly to a well established resort hotel.

Adjudication dated May 20, 2011 ("Adjudication"), 105. Commissioner Kenneth I. Trujillo filed a dissenting opinion, based on his view that the Bushkill proposal presented the "greatest possibility for financial success with the lowest risk." Dissenting Opinion dated May 20, 2011, 1.

Appellant filed a petition for review of the Board's decision directly in this Court, claiming that the Board erroneously awarded the slot machine license to Woodlands. Under the Act, this Court has exclusive jurisdiction over appeals from licensing decisions of the Board. 4 Pa.C.S. § 1204 ("The Supreme Court of Pennsylvania shall be vested with exclusive appellate jurisdiction to consider appeals of any final order, determination or decision of the board involving the approval, issuance, denial or conditioning of a slot machine license or the

award, denial or conditioning of a table game operation certificate.").

### Issues and Standard of Review

Appellant raises the following specific issues in its appeal:

1) Whether the Board erred as a matter of law in concluding that Woodlands was eligible to hold a Category 3 slot machine license, where Woodlands failed to establish that its proposed gaming facility was not [sic] located "in" a well-established resort hotel;

2) Whether the Board erred as a matter of law in determining that Woodlands was eligible to hold a Category 3 slot machine license, where Woodlands failed to establish that it had 275 guest rooms under common ownership at the time of its application;

3) Did the processes and procedures developed and utilized by the Board for evaluating and awarding the Category 3 slot machine license violate [appellant's] due process rights; [3]

4) Did the Board misapprehend and misapply the Gaming Act by placing undue emphasis on the "quality of the facility" factor in awarding the Category 3 slot machine license to Woodlands, while failing to consider other material factors sufficiently;

5) Was the Board's licensing decision inconsistent with the legislative objectives of assisting the horse racing industry and generating new revenue for the Commonwealth;

6) Did the Board err as a matter of law by failing to apply the "prudent man" standard in determining that Woodlands and its affiliates were financially suitable and of good character so as to justify licensure;

**3.** Appellant's discursive argument on this issue contains numerous subparts, in which appellant claims that the Board violated its due process rights when it: refused to reopen the record; held executive sessions in violation of the Sunshine Act; erroneously denied reconsideration of its decision in light of a newly available grand jury report; was unduly influenced by commentary from the public and politicians, as well as "unauthenticated" public opinion petitions; improperly conducted unannounced site visits; and placed too much emphasis on the "quality of the facility." Appellant's Brief at 25–47.

7) Was the Board's determination that Woodlands and its affiliates were of good character and financially suitable for licensure made with a capricious disregard of evidence.

Appellant's Brief at 4.

We consider appellant's claims in light of our legal standard of review, which is expressly mirrored by the Act. This Court "shall affirm all final orders, determinations or decisions of the board involving the approval, issuance, denial or conditioning of a slot machine license ... unless it shall find that the board committed an error of law or that the order, determination or decision of the board was arbitrary and there was a capricious disregard of the evidence." 4 Pa.C.S. § 1204. With regard to an error of law, our review is *de novo*, and our scope of review is plenary. *Pocono Manor Investors, LP v. Pa. Gaming Control Bd.*, 592 Pa. 625, 927 A.2d 209, 216 (2007). We have defined a "capricious disregard" as a "willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result." *Riverwalk Casino, LP, v. Pa. Gaming Control Bd.*, 592 Pa. 505, 926 A.2d 926, 929 (2007) (citations omitted).

### Argument

Appellant first argues that Woodlands is not eligible for a Category 3 license under the Act because its gaming facility would be located in a "free standing building more than 1.2 miles from its main hotel complex," which does not comply with the Act's requirement that the gaming facility be located "in a well-established resort hotel." Appellant argues that the Board interpreted the word "in" too expansively and thus undermined the legislative intent. Appellant states that had the General Assembly meant that the gaming facility could be "anywhere on the property," it would have said "on the grounds of the resort" or other words to that broader effect, instead of requiring that the gaming facility be "in" the hotel. Appellant further argues that Woodlands failed to demonstrate that it had 275 guest rooms as mandated by the Act.

Appellant claims that the record does not support the number of rooms submitted by Woodlands, and that many of the identified "guest rooms" are actually condominiums or private townhomes that are not owned by Woodlands "in fee" and should not be counted toward the final statutory total requirement.

Next, appellant argues that the Board violated its due process rights in various ways. Appellant claims that the Board improperly denied its request to reopen the record so that it could introduce alleged newly discovered financial information about Woodlands. Appellant claims that this new evidence would have "raised serious doubts" about the ability of Isle of Capri ("IOC"), the contracted management company for the Woodlands gaming facility, to handle new casinos at Woodlands and in Missouri simultaneously. Appellant further asserts that, to the extent the Board did consider this information on the basis of documents submitted *ex parte* by Woodlands itself, after the close of the record, and to the extent the Board held closed executive sessions to receive evidence and deliberate, it did so in violation of Sunshine Act requirements for open agency meetings. *See* 65 Pa.C.S. § 704 ("Official actions and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public unless closed under section 707 (relating to exceptions to open meetings), 708 (relating to executive sessions) or 712 (relating to General Assembly meetings covered).").

Appellant also claims that the Board erroneously denied its request for reconsideration in light of a report dated May 19, 2011, from the Thirty–First Statewide Investigating Grand Jury, that "identified serious procedural irregularities in the Board's investigative, regulatory and licensing processes." Appellant's Brief at 30. Appellant states, "Had the conclusions of the Grand Jury Report been available to [appellant] during the pendency of its licensing application, [appellant] certainly would have formally objected to several of the Board's processes and procedures." *Id.* at 31. Although the Board did entertain oral argument on appellant's petition for reconsideration, which was filed after the grand jury report

was released, appellant complains that it did not have notice of the witnesses to be presented at argument, nor was appellant permitted to question those witnesses, and the decision to deny reconsideration was rendered by the Board after a closed executive session. Appellant argues that the Board erred by failing to reconsider its licensing decision in light of the grand jury report regarding Board procedures.

Next, appellant argues that improper political influences affected the Board's decision in violation of appellant's due process rights. Specifically, appellant claims that the Board erred as a matter of law when, despite initially being dead-locked on the Category 3 license vote, it deferred its decision until after two new commissioners were appointed to the Board. Appellant says that the deferral was after "powerful, persuasive politicians—some of whom were responsible for appointing Board members—voiced opposition to [appellant's] proposal during the hearing process and deliberations." Appellant's Brief at 37. Moreover, appellant asserts that one of the new Board members should have disclosed the prior receipt of a political contribution from one of the successful applicant's principals.[4]

Appellant also argues that the Board erred as a matter of law by allegedly considering evidence outside the record, when two new Board members made unannounced visits to the applicants' properties after the close of the formal record. Appellant objects to Commissioners Moscato and McCall going to the sites "to see firsthand what they had to offer," when appellant had no opportunity to counter their experience or answer any questions that might have arisen as a result of the surprise visits. In addition, appellant argues that the Board erred by over-emphasizing the Act's "quality of the facility"

4. Specifically, appellant states that Commissioner Keith R. McCall received a political contribution from Joseph Hardy, III, a principal of Woodlands, when McCall was Speaker of the Pennsylvania House of Representatives, prior to his appointment to the Board. Appellant states McCall should have *sua sponte* recused himself from the decision-making process on the basis of Hardy's contribution. Appellant also complains that then-Governor Edward G. Rendell publicly opposed its proposal to place a gaming facility in Gettysburg, because of its proximity to the national civil war battleground site.

factor in selecting Woodlands. *See* 4 Pa.C.S. § 1325(c). According to appellant, this factor was meant to be an "optional" consideration, yet the Board improperly made Woodland's facilities the "central focus of the Adjudication, gushing for at least sixteen paragraphs and several pages about such important qualities as whirlpools, paintball, sleigh rides, and zebras." Appellant's Brief at 44. Appellant argues that the Board overlooked the mandatory factors for consideration, ignoring "grave concerns regarding IOC's financial suitability," and instead focused on the less important "quality" factor. *Id.* at 45.

Moreover, according to appellant, its due process rights were violated when the Board used unreliable and unauthenticated "public opinion petitions" to support its decision. Based on these petitions, the Board found that 27,352 individuals opposed appellant's application, but appellant argues that the signatures were not authenticated and the Board improperly relied on them. In addition, appellant claims that the selection of Woodlands for the slots license undermines the Act's objective of assisting the horse racing industry; according to appellant, Woodlands will have a negative impact on revenues from The Meadows Racetrack and Casino ("The Meadows"), a Category 1 facility located just 44.67 miles away from Woodlands. Appellant claims that the Board ignored "voluminous" evidence about this "cannibalization" problem. In addition, appellant argues, the Board's selection of Woodlands as the applicant most likely to produce new revenue reflects a capricious disregard of evidence regarding the saturation of the southwestern Pennsylvania gaming market, and the unreasonable assumptions included in the financial projections of Woodlands, which is located in a sparsely populated, remote area.

Finally, appellant argues that Woodlands and IOC failed to produce clear and convincing evidence of their financial suitability for licensure, as required by 4 Pa.C.S. § 1313(a), (e) (Board shall make finding that applicant is likely to maintain financially successful business operation and maintain steady level of growth of revenue to Commonwealth), and the Board should have applied the "prudent man" rule in its review of

financial suitability. Appellant claims that the Board's decision to grant the license to Woodlands was arbitrary, and the Board willfully disregarded evidence that: 1) Woodlands would exacerbate the market saturation that already exists in southwestern Pennsylvania; 2) Woodlands would produce the lowest revenues of any Category 3 applicant; 3) its affiliation with 84 Lumber makes Woodlands financially unsuitable for licensure;[5] and 4) IOC, the proposed operator for Woodlands, has competing interests that make it unsuitable for licensure.[6]

In response, the Board argues that its decision was proper, and should be affirmed, given this Court's highly deferential standard of review and limited scope of review. The Board argues that appellant's challenge to its decision is not based on any attempt to argue that its own proposed gaming facility was superior to Woodlands, but rather, that the Board's process was improper. Moreover, according to the Board, the appeal is flawed by repeated waiver of issues, conjecture, distortions of fact and assertions of improprieties made by appellant in reckless disregard of the facts of record.

The Board rejects appellant's argument that Woodlands should have been disqualified because its gaming floor is located in a separate building on the resort grounds rather than in the same building as the hotel rooms. The Board asserts that Woodlands was indeed eligible for the Category 3 license as its gaming floor is located "in" its hotel, as that term is defined by the Act. According to the Board, for the purposes of the Act and the Board's regulations, a gaming facility is "in" a well-established resort hotel if it is located on the

5. Specifically, appellant claims that 84 Lumber has experienced significant financial difficulties that resulted in the closing of stores and sale of various assets, and argues that the financial instability of 84 Lumber undermines the financial stability of Woodlands. Notably, however, although 84 Lumber was begun by Joseph Hardy, who is the founder of the Nemacolin resort and grantor of the 2001 Irrevocable Trust for Margaret H. Magerko (the "2001 Trust"), and Hardy and Magerko are two of the principals of Woodlands, 84 Lumber is not an owner of Woodlands. *See* Order dated May 20, 2011.

6. Specifically, appellant cites the fact that IOC was awarded a casino license in Missouri; appellant argues that IOC's financial fitness to collaborate on the Woodlands gaming project has been undermined as a result.

grounds of the resort or within an existing facility that is used as part of the resort. The Board emphasizes that the definition of "hotel" in the Act states that it is "a building or buildings in which members of the public may, for a consideration, obtain sleeping accommodations"—thus, the "hotel" may consist of multiple buildings. 4 Pa.C.S. § 1103. Accordingly, the Board asserts its decision to award the license to Woodlands was reasonable and not contrary to law on this point.

The Board also insists that Woodlands is eligible for the Category 3 license because it has 275 guest rooms under common ownership, in accordance with 4 Pa.C.S. § 1305(a)(1) and, in any event, appellant waived any challenge to this aspect of the Woodlands application. The Board notes that, even if forty-two rooms in the Falling Rock portion of the resort, which are available only seasonally, were subtracted from the total room count of 322, Woodlands still has 280 rooms and thus satisfies the Act's requirements.

The Board further asserts that there were no due process violations in its consideration of the instant slots license applications. First, the Board argues that it did not err when it denied appellant's motion to reopen the record in order to introduce further information relating to the financial suitability of Woodlands. Regardless of its decision not to reopen the record, the Board states that the new financial information regarding Woodlands which was proffered by appellant was actually submitted to the Board's Financial Investigations Unit ("FIU"), and the Board reviewed it in the context of the Fill's report on Woodlands before making its decision. Moreover, the Board states that its application process is ongoing, and that it also properly considered information supplied by Woodlands after the record was closed. *See Pocono Manor,* 927 A.2d at 220 (Board did not err by taking additional evidence after deadline; Board viewed process as "fluid" and "envisioned that further evidence would be taken on an as needed basis and such evidence would be made part of the record"); *Station Square,* 927 A.2d at 245 (application process is fluid and anticipates submission of additional materials by applicants).

Next, the Board argues that it did not err when it denied the petition for reconsideration that appellant filed in light of the contents of the May 2011 grand jury report. To the extent that the report criticized the process before the Board, the Board notes that appellant did not raise any objections on these grounds during the proceedings in this case. The Board also claims that political influence did not affect its decision, contrary to appellant's allegations, and that appellant never raised the issue of political influence during the proceedings below. Similarly, the Board argues, appellant never raised any objection to the resignation and replacement of two Board members during the pendency of these proceedings, and that there is no evidence of bias or impropriety arising from the personnel change. Moreover, the Board argues, due process was not offended when these new members made unannounced visits to the applicants' proposed facilities.

The Board further claims that it did not place undue emphasis on the "quality of the facility" factor in awarding the slots license to Woodlands, nor did it fail to consider other material factors sufficiently. The Board asserts that it properly considered the quality of the applicants' proposed facilities, as well as other statutorily prescribed factors such as: location; potential traffic concerns; potential for job creation, economic development, and revenue generation; community commitments; diversity plans; history of developing tourism ancillary to gaming; potential adverse effects; and record of compliance with employment and wage laws. *See* 4 Pa.C.S. § 1325(c).

Next, the Board argues that appellant overstates the impact of negative public commentary the Board received regarding appellant's proposed gaming facility. The Board states that it correctly understood that appellant's facility would not directly abut the Gettysburg National Park, and that the facility would not be expanded in the direction of the Park, and therefore the Board concluded that it would not have any ill effect on the Park's historical significance. But, the Board states that appellant's own witness indicated that an "unacceptably" large portion of local residents (38%) did not want a

gaming facility to operate in Adams County, and that this data was properly considered in the Board's decision-making process. Moreover, the Board rejects appellant's argument that Woodlands is located too close to The Meadows in Washington County, and thus undermines the Act's goal of supporting the horse racing industry. The Board points out that the Act provides very specific requirements about distance between licensed gaming facilities, and, because Woodlands complies with these requirements, appellant's argument that Woodlands will cannibalize revenues from The Meadows is without merit.

The Board further argues that it did not capriciously disregard evidence when it determined that Woodlands was the applicant that could produce the most new revenue for the Commonwealth. In addition, the Board asserts that revenue generation is not the sole purpose of Category 3 gaming facilities, and that its award of the license to Woodlands also serves the Act's purpose of enhancing the development of the tourism market by bringing out-of-state patrons into the Commonwealth for gaming, thus minimizing cannibalization of revenue from other gaming facilities.

Next, the Board argues that its actions in selecting Woodlands should not be reviewed by this Court under a "prudent man" standard, as referenced in Section 1201(h.2) of the Act, but rather must be reviewed for arbitrariness or a capricious disregard of the evidence pursuant to the express appellate standard of review set forth in Section 1204 of the Act, and by our own jurisprudence. *See Greenwood Gaming,* 15 A.3d at 886–87 (Court's review of Board's decision is limited to determining whether Board erred as matter of law or acted arbitrarily and in capricious disregard of evidence); *Station Square,* 927 A.2d at 242 (Act narrowly confines this Court's appellate review). Even though Woodlands had the lowest annual revenue projection of the applicants, this was not the sole factor for the Board's consideration. The Board claims its conclusion that Woodlands was financially suitable was neither arbitrary, nor made in capricious disregard of the evidence.

Finally, the Board insists that its determination regarding the financial and character suitability of certain Woodlands principals was proper, and that appellant's arguments on this issue are based on speculation and baseless conspiracy theories, rather than facts of record.[7] According to the Board, all allegations of wrongdoing were adequately explained to the satisfaction of the BIE, which reports to the Board. The Board further states that it properly held a closed executive session during which it received evidence relating to these allegations because they are protected as confidential under the Act. See 4 Pa.C.S. § 1206(f). Finally, the Board asserts that no timely objections to the procedure employed were lodged in any event. See 58 Pa.Code § 441a.7(t) (written objection to conduct of Board hearing or procedure must be filed no later than two business days after event giving rise to objection or be deemed waived).

Woodlands has filed a brief in support of the Board's decision, in which it echoes many of the Board's arguments. Woodlands asserts that the Board properly considered various suitability criteria set forth in the Act that led to the Board's correct determination that the slots license should be awarded to Woodlands. Woodlands notes that this Court must apply a deferential standard of review to the Board's decision, and should hold that the Board did not act arbitrarily or with a capricious disregard for the evidence in making its decision. According to Woodlands, this appeal is no different than every other appeal from a licensing decision under the Act, where a

7. A sizeable portion of the record in this case has been sealed by stipulation, due to the sensitive nature of various allegations made with regard to financial viability and character suitability of the applicants. The General Assembly recognized the sensitive nature of some of the information the Act requires applicants to submit to the Board in furtherance of its investigations of suitability, and the Act provides procedures for maintaining confidentiality in such instances. See 4 Pa.C.S. § 1206(f) (confidentiality of information obtained by Board or BIE); 58 Pa.Code § 441a.7(l) (applicant may request that confidential information be presented to Board in closed deliberations). See also Station Square, 927 A.2d at 240 n. 7 (this Court will address appellate arguments regarding confidential matters "with as much specificity as we can without disclosing information that has not otherwise been made public").

disappointed applicant claims that the successful applicant is actually ineligible or unsuitable for licensure. All such appeals have failed, and Woodlands insists that, given this Court's standard of review and the Board's broad discretion, appellant's challenge likewise fails, and the Board's decision should be affirmed.

Woodlands further opposes appellant's claims regarding violations of due process by quoting appellant's counsel, who, at a suitability hearing regarding its application, thanked "the Board and its staff for the exceptional professionalism and fairness with which we were treated throughout this entire process." Woodlands Brief at 32 (citing N.T. 11/16/10, 14–15; R.R. 830a–831a). Woodlands argues that appellant incorrectly assumes that the gaming licensing process is an adjudicative process subject to the "considerations of due process that apply to criminal and civil judicial or administrative agency proceedings." Woodlands Brief at 32–33 (citing *Pocono Manor*, 927 A.2d at 223).

Woodlands also argues that the Board did not err in denying reconsideration based on the grand jury report, which concerned the processing of certain Category 1 and 2 license applications in 2006, and contained no reference to the Category 3 license proceedings in this case. According to Woodlands, appellant has presented no evidence suggesting that issues raised in the grand jury report applied to this case. Moreover, Woodlands claims that this Court has already held that a capricious disregard of evidence cannot be said to exist where the Board had addressed potential suitability concerns in a confidential executive session, as it did here. *See Pocono Manor*, 927 A.2d at 230. Finally, Woodlands rejects appellant's proffered "standard" for reviewing applicant suitability—that the Board should ensure that "no stone was left unturned"—and argues instead that it was sufficient that the BIE and the Board found on the facts of record that Woodlands and its principals established their character suitability by clear and convincing evidence. *See* 4 Pa.C.S. § 1310(a)(1).

In reply, appellant repeats its argument that the evidence does not support the finding that Woodlands has the requisite

number of guest rooms with common ownership. En addition, appellant claims it cannot be held to have waived objections relating to events that transpired after the record was closed. Appellant further argues that its allegations of political bias or influence must be considered by this Court, as the Act provides no other "procedural mechanism for investigating whether [that bias] tainted the Category 3 licensing process." Reply Brief at 9. Appellant also repeats its claim that it was prejudiced by unannounced site visits by Board members. Finally, appellant reiterates its position that the evidence revealed that its application was superior to those of the other applicants for this Category 3 slots license.

### Discussion

As stated, we consider each of appellant's claims in light of our statutorily and judicially prescribed standard of review—we must affirm unless we find that the Board committed an error of law, or acted arbitrarily and with a capricious disregard of the evidence. 4 Pa.C.S. § 1204. *See also Pocono Manor*, 927 A.2d at 216. We may not simply substitute our judgment for the discretionary decision-making authority of the Board. *Id.* at 225.

### A. *Location of Gaming Facility "in" a Well–Established Resort Hotel*

First, appellant claims that the Board improperly awarded the slots gaming license to Woodlands because its gaming facility is not located "in" a well-established resort hotel, as required by 4 Pa.C.S. § 1305(a). The Board did not err in rejecting this argument. It is correct that the Woodlands gaming facility is to be located in an existing structure on the resort grounds, about 1.2 miles from the primary hotel complex. However, the Act expansively defines "hotel"—as used in Section 1305 specifically regarding Category 3 slot machine licensing—as "a building or buildings in which members of the public may, for a consideration, obtain sleeping accommodations." 4 Pa.C.S. § 1103 (subsection (2) of defini-

tion of "Hotel").[8] The Board concluded:

> Indeed, a resort with substantial year-round guest amenities often must, by its very nature, be comprised of multiple buildings on the same property. It would therefore be inconsistent with the Act if the Board were to adopt an unduly restrictive interpretation of the term "in," like the one advanced by [intervenor Washington Trotting Association], and require that a well-established resort hotel and casino be housed entirely in a single building.

Adjudication, 66. Given the plain language of the Act's definition of the term "hotel," in the Category 3 slot machine licensing context, we conclude that the Board did not err in interpreting the term "in" broadly enough to cover the circumstances presented by the Woodlands application. *See also Greenwood Gaming*, 609 Pa. 368, 15 A.3d 884 (affirming award of Category 3 slots license to Valley Forge Convention Center, where gaming facility was housed in separate building from hotel).

B. *Number of Guest Rooms*

In its second issue, appellant argues that the Board erred in granting the slots gaming license to Woodlands because Woodlands failed to establish that it had 275 guest rooms under common ownership at the time of its application, as required by the Act. *See* 4 Pa.C.S. § 1305 (to be eligible to apply for Category 3 slots license, applicant must seek to locate its gaming facility "in a well established resort hotel having no fewer than 275 guest rooms under common ownership and have substantial year-round recreational guest amenities"). However, the Board found that Woodlands has five "lodging opportunities, totaling 322 guest rooms."

> The lodging consists of the Chateau Lafayette, the Lodge, Falling Rock, private townhouses, and private luxury

---

**8.** When used elsewhere in the Act, "hotel" is more narrowly defined as "one or more buildings owned or operated by a certificate holder which are attached to, physically connected to or adjacent to the certificate holder's licensed facility in which members of the public may, for a consideration, obtain sleeping accommodations." 4 Pa.C.S. § 1103 (subsection (1) of definition of "Hotel").

homes. The Chateau Lafayette is modeled after the "classic hotels" of Europe and has 124 guest rooms. The Lodge is the original hotel at Nemacolin and was a private hunting lodge. After renovations, the Lodge now has 97 guest rooms modeled after classic English countryside inns. Falling Rock is the newest addition to the resort and consists of 42 rooms. The Nemacolin Woodlands townhouses consist of 54 units that are typically rented for groups or families. The townhouses feature either a one or two-bedroom unit.

Adjudication, 69 (footnote omitted). The Board acknowledged that the forty-two rooms located in Falling Rock were not available year-round, and for purposes of its decision, subtracted that number from the total of 322, to yield 280 guest rooms, still sufficient to meet the statutory minimum. *Id.* at 69 n. 14. Additional guest space in an "RV Park" at the resort was not counted toward this total. N.T. 11/17/10, 158; R.R. 1391a.

The Board argues that this issue was waived by appellant, but it appears that appellant did raise the room count/common ownership question in the broadest of terms in its Notice of Intent to Present Comparative Evidence (declaring that Woodlands "does not have the 275 guest rooms under common ownership required by the Gaming Act"), and in its Post–Hearing Brief (alleging that Woodlands "failed to clearly and convincingly prove that it has 275 guest rooms under common ownership"). In those filings, appellant argued that Woodlands offers only 242 qualifying guest rooms. For purposes of decision, we will assume that the room challenge is preserved.

As to the merits of its claim before this Court, appellant focuses on the alleged lack of specific proof of ownership of every Woodlands guest room, some of which are included in condominiums and other types of accommodation that are part of the resort and variously described by Woodlands as "townhomes" or "privately owned luxury homes." Appellant refers to discrepancies between the room count information presented in the Woodlands application, which placed the number of qualifying rooms at 335 or 336 (*see* Woodlands Application, Appendix 1 (336 rooms); Appendix 29 (335 rooms)), the BIE's

suitability report (322 qualifying rooms), and the Board's Adjudication (322 or 280 rooms). Perhaps because any of these numbers exceeds the 275 statutory minimum, appellant concedes that "the disparities in the numbers may not by themselves be significant," but nevertheless declares that they "reveal a level of imprecision that is unacceptable." Reply Brief at 3 n. 1. Neither the statute nor common sense authorizes reversal of the Board's decision because of an immaterial lack of precision.

In any event, it no doubt is true that documentary proof of lodging ownership submitted by Woodlands could have been more succinct and precise. The one document that purports to show that all of the properties used by Woodlands to comprise its guest room count are actually owned by Woodlands is a spreadsheet that lists the properties and simply states they are "All owned 100%." Woodlands Application, Appendix 31. However, taken together with explanations provided by counsel for Woodlands during presentations to the Board,[9] and in the absence of proof presented below to contradict that the rooms were "all owned 100%" by Woodlands,[10] the record fully supports the Board's conclusion that the number of qualifying rooms satisfied the statutory minimum. Given our deferential standard of review, we cannot conclude that the Board acted arbitrarily or capriciously disregarded evidence in making its findings here.

## C. *Due Process*

Next, appellant raises a litany of claims under the broad rubric of due process, challenging various procedures utilized

9. Counsel provided additional details about the Woodlands guest room count during the licensing hearing for Woodlands. N.T. 11/17/10, 159–160; R.R. 1392a–1393a. The Board then answered questions regarding its room count for Woodlands during a hearing on appellant's petition for reconsideration. N.T. 6/8/11, 31–33; R.R. 2313a–2315a.

10. Appellant claims that "a basic sampling of title abstract reports ordered by [it] in conjunction with this appeal demonstrate [sic] that five of those units are **not** owned by Woodlands, and the ownership of several other properties was unverifiable." Appellant's Brief at 23 (emphasis in original). This information was apparently not made part of the record below.

by the Board during its consideration of the applications for the Category 3 slots license it ultimately awarded to Woodlands. The Board notes that no applicant filed written objections, or raised any oral objection, during the course of its hearings relating to the procedure utilized for the conduct of the hearing process generally, or as to any particular error. Adjudication, 16.

Notably, the Board has adopted regulations establishing specific procedures for making objections during the Board's hearing process. *See* 58 Pa.Code § 441a.7(t) (applicant may raise objection to conduct of hearing, procedure, process or rulings of the Board as it relates to its own hearing or to hearing of competitive applicant; written objections must be filed within two days). The regulations also state that the Board's hearings shall be conducted in accordance with certain rules governing administrative hearings generally. *See* 58 Pa.Code § 494a.2 ("Oral hearings will be conducted in accordance with 1 Pa.Code §§ 35.121–35.126 and Subchapter C (relating to evidence and witnesses)."). *See also* 1 Pa.Code § 35.126(b) ("When objections to the admission or exclusion of evidence before the agency head or the presiding officer are made, the grounds relied upon shall be stated briefly. Formal exceptions are unnecessary and may not be taken to rulings thereon."). The Board's regulations describe additional procedures for objections by applicants generally. *See, e.g.,* 58 Pa.Code § 494a.1(c) ("In oral and documentary hearings, neither the Board nor the presiding officer will be bound by technical rules of evidence, and all relevant evidence of reasonably probative value may be received. Reasonable examination and cross-examination will be permitted at all oral hearings."); 58 Pa.Code § 494a.7(a) ("A party may file exceptions to the report or report and recommendation of the presiding officer within 15 days of the date of the report or report and recommendation, unless the time is extended upon good cause shown."). The requirement of timely, specific objections is reasonable and obviously serves a salutary purpose. *See, e.g., Criswell v. King,* 575 Pa. 34, 834 A.2d 505, 509–10 (2003).

■ Turning to appellant's individual due process complaints, appellant first claims that it was denied due process and was prejudiced because of a political contribution made by Woodlands principal Joseph Hardy to Board member McCall, who was previously a member of the State House. It appears that the contribution was made prior to McCall's appointment to the Board, *see supra*, n. 4. Our review of the record confirms the Board's argument that appellant did not raise any objection to McCall's participation in the licensing decision until this appeal, and this claim is therefore waived.

■ Appellant also challenges the Board's refusal to reopen the record so appellant could introduce what it said was newly discovered financial information about Woodlands, and the Board's refusal to reconsider its award to Woodlands in light of a grand jury report released on May 24, 2011. A review of the Board's procedures during the instant licensing process reveals the following. The Board heard testimony and argument regarding each applicant at public "suitability hearings" in November 2010. The Board's public hearing regarding Woodlands took place on November 17, 2010. N.T. 11/17/10, 1–198; R.R. 1234a–1432a. *See* 4 Pa.C.S. § 1205(b) (Board shall hold at least one public input hearing prior to approving slot machine license application, and shall also establish public comment period during which members of public may address Board regarding application). In addition, the Board questioned the Woodlands witnesses and counsel regarding the financial viability of the principals (the 2001 Trust and Nemacolin resort) and other related entities (84 Lumber, IOC). N.T. 11/17/10, 112–122; R.R. 1345a–1355a. A witness from intervenor Washington Trotting Association ("WTA"), representing gaming competitor The Meadows, testified in opposition to the Woodlands application, and Woodlands had an opportunity to respond, as well as to file a post-hearing brief. *See* 1 Pa.Code § 35.125(b) (describing procedure where intervenor presents evidence at hearing); 58 Pa.Code § 494a.9(a) (parties may submit briefs prior to Board's final order).

Also, the record indicates that appellant corresponded with the Board regarding testimony and evidence presented by

Woodlands at its public input hearing, in forwarding its own opposition to the Woodlands application. R.R. 1687a–1694a. Finally, appellant filed a petition to reopen the record seeking to present additional financial information about Woodlands. *See* 58 Pa.Code § 494a.6(f) (Board may reopen proceeding for receipt of further evidence if it has reason to believe facts or law have changed as to require reopening). The Board denied the petition, but it nevertheless forwarded appellant's additional materials and argument regarding the finances of Woodlands to its FIU, which produced an addendum report for the Board, in advance of the Board's final decision on the Category 3 slots license applications. *See* Memorandum dated June 10, 2011, 5–7. The Board's actions in this regard were reasonable, and promoted the objective of an ongoing dialogue. *See generally Station Square*, 927 A.2d at 245 (slots license application process was "fluid, ongoing dialogue between the Board and the applicants" where "Board properly welcomed submission of additional material [that was] responsive to information contained in competitors' applications"); *Riverwalk*, 926 A.2d at 952 (slots license application process is meant to be somewhat "fluid," such that proposals need not remain static or unchanged after receiving public input). Thus, it appears that the Board considered the substance of appellant's petition to reopen the record, despite its official decision not to formally reopen the record.

Once the Board awarded the slots gaming license to Woodlands, appellant filed a petition for reconsideration, focusing on the May 24, 2011 Report of the Thirty–First Statewide Investigating Grand Jury, which the parties apparently did not receive until after the Board issued its Order and Adjudication. *See* 58 Pa.Code § 494a.8 (party may file application for rehearing or reconsideration by filing petition within 15 days after Board's final order). According to appellant, the grand jury report highlighted several areas in the Commonwealth's gaming license process that the grand jury felt were deficient, unfair or inappropriate, and warranted the Board's reconsideration of its award of the slots license to Woodlands. Appellant also sought to challenge the criminal background investigation

undertaken with regard to principals of Woodlands. The Board heard argument on these claims at an expedited public hearing on June 8, 2011, although the Board questioned whether it was even required to entertain such a reconsideration motion. N.T. 6/8/11, 1–49; R.R. 2283a–2331a. *See* 58 Pa.Code § 494a.8(f) (procedure for petitions for rehearing or reconsideration does not apply to final order, determination or decision of Board involving approval, issuance, denial or conditioning of licensing applications which are subject to appellate requirements of 4 Pa.C.S. § 1204). The Board denied the petition for reconsideration and explained its reasoning in a Memorandum dated June 10, 2011. R.R. 2421a–2432a.

The Board's willingness to entertain appellant's request for reconsideration in this case and to explain its decision, despite the absence of a specific requirement or procedure in the Act along those lines, other than the direct appeal under Section 1204, was perhaps a response to this Court's prior remarks about deficiencies in the Board's post-decision process, and the need to provide more opportunity for applicant objections generally. We have noted:

> The instant licensing proceedings are distinct from any other proceedings in this Commonwealth—indeed, they are *sui generis*. Certainly, the proceedings before the Board are neither a trial nor are they akin to unemployment or workers' compensation proceedings. While the proceedings of all applicants are related inasmuch as the parties are all vying for the same thing, *i.e.*, the award of a gaming license, there are also many aspects of the application process in which the Board deals with each applicant individually. The other applicants are not necessarily privy to such one-on-one interactions except their own. The applicants that were denied a license must be given an opportunity to challenge the Board's decision, since the Act provides as much under § 1204 [relating to direct appeal to Supreme Court].

*Station Square,* 927 A.2d at 241 (noting that Board asserts claims were waived but "has not pointed this [C]ourt to anything reassuring us that [losing applicants] had a way in which to lodge such objections to the financial suitability

inquiry conducted by the Board" with respect to winning applicant). *See also Pocono Manor,* 927 A.2d at 218 (applicants denied license "must be given opportunity to challenge Board's decision"; Act provides direct appeal to Supreme Court but no "mechanism for raising such challenges during the pendency of the proceedings") and *id.* at 218 n. 7 ("[W]e encourage the Board to adopt a procedure for lodging procedural objections ... it would have been beneficial to have a decision by the Board rather than relying on statements made by the Board in its responsive Brief before this [C]ourt."); *Station Square,* 927 A.2d at 252 (Castille, J., dissenting) (criticizing Board's failure "to allow for the equivalent of a post-verdict procedure"). It appears that the Board has attempted to provide more realistic opportunities for disappointed applicants to preserve error and complete the record in preparation for an appeal to this Court.

■ Turning to the merits of appellant's claim based on the post-decision release of the grand jury report, our review reveals that the report did not identify any problems in the Board's procedures specific to the Category 3 slots license awarded to Woodlands in the case *sub judice. See* Grand Jury Report No. 1, Thirty–First Statewide Investigating Grand Jury, R.R.1947a–2044a. During argument on appellant's petition for reconsideration, which was based in part on issues arising out of the grand jury report, Commissioner Trujillo accurately stated that the report referred to proceedings that took place well before the instant matter, and with regard to Category 1 and 2 gaming licenses. N.T. 6/8/11, 34; R.R. 2316a. Specifically, the report referred only to the gaming license applications of Presque Isle Downs, Inc., Mt. Airy # 1, L.L.C., Pocono Manor, PITG Gaming L.L.C., and Station Square Gaming, L.P. Grand Jury Report at 41–94. According to the Board, no documents were produced to the grand jury with respect to the Category 3 license proceedings involving appellant and Woodlands. N.T. 6/8/11, 37; R.R. 2319a. The Report thus does not speak directly to the proceedings in this dispute.

However, it is correct that the grand jury report does broadly criticize the inception and early operations of the Board, in great detail. The report identifies what the grand jury viewed as various problems with the Act's provisions, and also with the Board's execution of its power under the Act over the course of the grand jury's two-year investigation, including the Board's timeline for review of applications, its enactment of regulations, its conduct of investigations, its hiring and procurement practices, its use of closed executive sessions, its investigative process and preparation of suitability reports, and *ex parte* communications, and makes numerous recommendations for correction and improvement. Nevertheless, it is difficult to see how a grand jury investigation and ensuing report and recommendations provide a basis for reconsideration of a Board licensing decision under the Act; much less does such a report provide a basis for this Court to find that the Board's procedures here violated due process. The report represents the opinion of the grand jury, premised upon its investigation of matters other than the proceeding now before this Court for review. Nothing in the report specifically impugns the proceedings arising out of the applications of appellant and Woodlands. Accordingly, we cannot hold that the report undermines all proceedings that have taken place before the Board, regardless of whether specific objections were made during those proceedings, and regardless of appellant's failure to provide specific evidence to support its claims of unfair practices.

With respect to appellant's claim that the Board should expressly consider the grand jury report and so state in an updated adjudication, the Act imposes no such requirement. Nevertheless, we note that the Board did file a Memorandum explaining its decision to reject appellant's claims based on the grand jury report. Thus, even if it is assumed that appellant had a due process right to have the rejection of its grand jury claim explained, that alleged right has been vindicated. The Board explained:

> The Board has thoroughly examined the Report of the Grand Jury, the findings contained therein and the recom-

mendations. To be clear, the Grand Jury Report does not mention the Category 3 licensing process recently completed by the Board, and does not make any findings as to the process employed by the Board in the recent award of the Category 3 license to Nemacolin Woodlands.

Memorandum dated June 10, 2011, 3. The Board recognized the grand jury report's value in a general sense, and went so far as to vow to consider the grand jury's findings and recommendations in future Board proceedings, but it also appropriately questioned the report's evidentiary value to this particular case. The Board ultimately held that the report did not provide a basis for reconsideration of its decision to grant a slots license to Woodlands. *Id.* at 10. We find no error, or violation of due process, in this determination.

■ Finally, the Board rejected appellant's allegations that the Board improperly went into private executive session during its consideration of the applications, explaining that certain information submitted to the Board on the issue of applicants' financial and character suitability is confidential, and the Act authorizes the preservation of confidentiality in this context. *See* 4 Pa.C.S. § 1206(f).[11] We find no error in the Board's use of a closed executive session to receive certain confidential information which applicants are required to submit under the Act. *See Pocono Manor*, 927 A.2d at 225 ("The Board is without authority to order disclosure of documents that are specifically required to be maintained and protected as confidential under the Act."); *Riverwalk*, 926 A.2d at 935 ("The Board must consider detailed confidential information regarding the applicants and their proposals in the course of weighing the relative merits of the proposals. Private deliberations are required to facilitate frank discourse by Board members regarding such confidential information and assessment of the relative strength and weaknesses of the appli-

11. As we have stated, certain portions of the record in this case were sealed by stipulation. Of course, if the stipulation to seal impeded this Court's ability to conduct effective appellate review, including an explanation of the basis for our decision, the seal would have to stand down. In this case, however, we have determined that our function may be discharged while honoring the purpose of the seal.

cants' proposals."); 65 Pa.C.S. § 708(a)(5) (Sunshine Act allows executive session to protect privileged or confidential information).[12]

 Next, we consider appellant's allegation that improper political influence affected the Board's decision in violation of appellant's due process rights. Appellant specifically argues that negative public statements by then-Governor Rendell about the location of appellant's proposed gaming facility unfairly affected the outcome here, and also, that two newly-appointed commissioners—allegedly appointed to break a Board deadlock in a politically expedient manner—unfairly made unannounced visits to the applicants' proposed facilities. The Board claims that appellant's assertions were waived for failure to present them below, and although appellant does not dispute the Board's allegation of waiver, appellant insists that we should nevertheless consider the issue because the Act provides "no procedural mechanism for investigating whether and how bias or political influence tainted the Category 3 licensing process." Reply Brief at 9.

Notwithstanding appellant's waiver of the issue, we note the Act provides very specific provisions regarding Board member appointment and removal, and there is nothing in the record to suggest that these procedures were violated while the instant license applications were pending. *See* 4 Pa.C.S. § 1201. In addition, the Act provides specific measures to

12. This author has previously dissented on the basis that the Board improperly used closed sessions during the licensing hearing process. *Riverwalk*, 926 A.2d at 953–56 (Castille, J., dissenting). Notably, the evidence received privately in the instant case—*e.g.*, allegations of a personal and sensitive nature, involving a principal of Woodlands, which had been recanted and expunged, and which did not lead to criminal prosecution, and allegations regarding the financial stability of a privately-held company related to Woodlands (84 Lumber)—is distinguishable from the evidence regarding traffic management plans, around which the Board held private sessions in *Riverwalk*. *See id.* at 956 (arguing that due process requires remand to allow applicant to address Board's "late-disclosed, dispositive concern" regarding comparative assessment of traffic management issues which were discussed in closed session). *But see Pocono Manor*, 927 A.2d at 230 (Board did not ignore alleged character issues related to applicant Louis DeNaples but instead properly conducted closed executive session to further consider his suitability).

insulate the Board from outside influence during its deliberations, for example, by prohibiting *ex parte* communications, *see* 4 Pa.C.S. § 1202.1(d), but there is nothing to indicate that the Board must be sequestered in some way, or that they were otherwise improperly influenced by their exposure to publicly available news reports and statements by public officials. Therefore, we reject appellant's claim that the proceedings should somehow be deemed tainted by then-Governor Rendell's comments about appellant's proposed location. The Governor is no less entitled to an opinion on siting gaming facilities than other citizens; and we cannot accept the notion that the mere expression of a view by the Chief Executive, or any other political figure, must be deemed to compromise the integrity of Board members. There is no evidence that public statements by any elected official had any undue influence on the licensing decision at issue, nor is there any allegation of improper *ex parte* communications on the matter.

Moreover, appellant has provided no authority to support the novel idea that new Board members were not free to visit the locations and facilities advocated by the applicants, which were operational and open to the public, much less that such visits must be assumed to be prejudicial to a particular party. We reject appellant's argument that the facilities themselves were somehow outside the record in this matter.

Similarly, we are unpersuaded by appellant's argument that the Board placed too much emphasis on negative public commentary about its location, and that this emphasis somehow represented a violation of its due process rights. *See Station Square*, 927 A.2d at 248 (Board "logically and properly" weighed negative comments from public in rendering licensing decision). There is nothing to indicate that the Board improperly considered the public support or opposition it heard with regard to each of the applicants. Indeed, the Act authorizes the Board to receive and consider public input about slot machine license applicants. 4 Pa.C.S. § 1205(b). The Act does not preclude the submission of petitions in support or opposition to a proposed gaming facility. We find no error of law on this issue.

### D. *"Quality of the Facility"*

 Further sifting through the Board's determination, appellant next argues that the Board placed too much emphasis on the "quality of the facility" factor identified in the Act. *See* 4 Pa.C.S. § 1325(c)(1) (Board may take additional factors into account when considering slots license application, including "location and quality of the proposed facility, including but not limited to, road and transit access, parking and centrality to market service area").[13] Essentially, appellant argues that this Court should re-weigh the Act's Section 1325(c) factors differently than the Board weighed the factors in granting the Category 3 license to Woodlands. However, the Act "does not grant us authority to act as a super-Board, employing our own discretion in determining which applicant we believe was the best applicant. We are not empowered to sift through the voluminous evidence, reweighing it. Our review in these matters is to determine whether the Board acted arbitrarily or in capricious disregard of the evidence when it considered these factors." *Station Square*, 927 A.2d at 250. Our careful review of the record reveals that the Board did not act arbitrarily or in capricious disregard of the evidence when it weighed the discretionary "quality of the facility" factor and determined that Woodlands performed better than the other applicants. The Board noted that the Nemacolin Woodlands resort sits on 2000 acres and provides numerous amenities, including two 18–hole golf courses, a spa, three fine dining restaurants, multiple casual dining outlets, an Adventure Center (including paintball, mountain biking, ATVs, zip-lines, climbing wall, archery, disc golf, miniature golf, tennis, volleyball, shooting, flyfishing, skiing, snowboarding, snow-tubing, cross-country skiing, dog sledding), multiple swimming pools, retail shopping, bowling, wildlife habitats featuring, *inter alia*, lions, tigers and bears, art collections, wine cellar, and meeting and banquet facilities. Adjudication, 49–51. The Board then concluded as follows:

**13.** The rest of the Section 1325(c) factors are set forth in the text *supra* at pp. 3–4.

[One] specific applicant stands head and shoulders above all the rest with respect to features and benefits it makes available to guests. By virtually any subjective, objective, or other quantifiable measure, the quality of Woodlands' facility far surpasses that of any other Category 3 applicant currently before the Board. In no single statutorily mandated category of accommodations required to meet the legal threshold of a well-established resort hotel is Woodlands bested by a competing applicant.

*Id.* at 92. The Board's conclusion on this issue is supported by the record.

The Board further explained its analysis of other Section 1325(c) factors, while comparing the applicants to one another, and why it determined that Woodlands was the better applicant in these other categories as well. *Id.* at 88–105. Appellant's contention that the Board was improperly "infatuated" with Woodlands, and unfairly "gushed" about its amenities, while it ignored what appellant believes were other, more important factors represents a point of view, but not a basis for finding reversible error under the Act, and our limited power of review. The competing merits of the various facilities were placed before the Board, and it is not our charge to reweigh that evidence. Accordingly, we conclude that this issue is without merit. *See Riverwalk*, 926 A.2d at 949 ("We agree with the Board that Riverwalk's argument is intended to persuade this Court that its proposal was superior to those submitted by the successful applicants. We will not supplant the Board's discretion by re-weighing factors that were considered by the Board.").

### E. *Act's Goal to Support Horse Racing Industry*

Next, appellant claims that the Board's award of a slots gaming license to Woodlands was inconsistent with the legislative aims of assisting the horse racing industry and generating new revenue for the Commonwealth. Appellant is correct that one of the stated goals of the Act is "to enhance live horse racing, breeding programs, entertainment and employment in this Commonwealth." 4 Pa.C.S. § 1102(2). Appellant argues

that this goal is undermined by the selection of Woodlands for a Category 3 slots license. Appellant relies in part on testimony in opposition to Woodlands presented by Bill Paulos, a representative of intervenor WTA, which operates The Meadows, a competing Category 1 casino and horse racetrack located about 50 miles away from Woodlands.[14] N.T. 11/17/10, 162–174; R.R. 1395a–1408a. Mr. Paulos testified to his opinion that a slots facility at Woodlands would improperly "cannibalize" revenue from The Meadows, and in that way would reduce income for horse racing interests. *Id.* at 168.

Although appellant argues that the Board ignored this evidence, the record does not support appellant's assertion, and instead shows that the Board sought to increase overall gaming revenue to the Commonwealth, which in turn would provide more income to the horse racing industry. The Board explained:

> Woodlands is likely to produce the most **new** revenue for the Commonwealth due to several factors. First, Nemacolin, Woodlands' proposed Category 3 facility, is located further [sic] away from any other currently licensed facility and is approximately 56 miles away from WTA, thus availing itself to a region of Pennsylvania that the Board believes is underserved by gaming interests. Next, Woodlands' close proximity to both Maryland and West Virginia; its on-site air strip; and its existing large number of out-of-state guests, all but ensures its potential to generate revenue via out-of-state patrons. Even without a Category 3 license, Woodlands currently draws 350,000 visitors annually, with 100,000 of those visitors staying overnight. Because of the quality of the Nemacolin property and the variety of amenities it offers, in 2010, Nemacolin attracted visitors from 44 different states and six (6) different countries.

Adjudication, 95–96 (emphasis in original). Notably, even Mr. Paulos conceded that he was "on the Commonwealth's side when it comes to choosing the Applicant who provides the

14. Appellant claims Woodlands is 44.67 miles from The Meadows; the Board states that Woodlands is 56 miles from The Meadows. The difference is immaterial to our decision.

highest incremental income." N.T. 11/17/10, 168. We find no error in the Board's determination on this issue. *See Greenwood Gaming,* 15 A.3d at 892 (Board did not act arbitrarily or capriciously disregard evidence when it determined, after hearing competing expert testimony, that Valley Forge slots gaming facility would only minimally impact other nearby gaming facility revenues).

F. *Financial and Character Suitability of Woodlands and its Principals*

1. *Prudent Man Rule and Financial Suitability*

Next, appellant argues that the Board erred when it failed to apply the "prudent man" standard in determining that Woodlands and its principals were financially suitable and of good character so as to justify licensure. The Act requires that slots gaming license applicants show their financial stability, integrity and responsibility, and that of their backers, by clear and convincing evidence. 4 Pa.C.S. § 1313(a). Appellant argues that, when the Board members consider such evidence, they are required to act as fiduciaries of the Commonwealth, and apply a "prudent man standard," because the Act mandates that the Board "shall exercise the standard of care required by 20 Pa.C.S. Ch. 73 (relating to municipalities [sic] investments) in the performance of their duties under this part." 4 Pa.C.S. § 1201(h.2). Here, the Act makes specific reference to the following provision in Title 20, Decedents, Estates and Fiduciaries:

**(b) Prudent man rule.**—Any investment shall be an authorized investment if purchased or retained in the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital. The authorization to make and retain investments pursuant to this subsection shall be in addition to, and independent of, authorizations to make

investments pursuant to other provisions of this chapter and requirements applicable under other provisions of this chapter shall not affect investments also authorized by this subsection.

20 Pa.C.S. § 7302(b).

In *Station Square*, this Court was presented with the question of the proper standard of care to be applied by the Board in making its determinations, but the majority opinion treated the question only as one regarding the standard of review by this Court on appeal. 927 A.2d at 241. Writing for the Court, Mr. Chief Justice Cappy stated that the "prudent man rule" does not "channel this Court's appellate review," and instead determined that this Court must affirm the Board's decision unless we find "an error of law or that the order, determination or decision of the board was arbitrary and there was a capricious disregard of the evidence," in accordance with the appellate standard of review expressly set forth in the Act. *Id.* at 242–43 (citing 4 Pa.C.S. § 1204). Applying the latter standard, the majority opinion concluded that "the Board did not act arbitrarily or in capricious disregard of the evidence when it found PITG financially suitable for licensure." *Id.* at 244. Messrs. Justice Eakin and Fitzgerald joined the majority opinion, and Madame Justice Baldwin filed a joining concurring opinion.

However, in separate responsive opinions, four Justices stated the view that the prudent man rule indeed may play a role in our review. Justice Baldwin, whose joinder provided the fourth vote to create the majority view, stated that she "read the majority opinion to confirm that the 'prudent man' standard of care, imposed upon the Board, is subsumed within the standard of review for this Court ..." 927 A.2d at 252 (Baldwin, J., concurring). Also in concurrence, Messrs. Justice Saylor and Baer, likewise stated a view that the "prudent man rule" applies to the Board's actions in licensing decisions, and should be considered by this Court in its appellate review of decisions implicating that rule. With characteristic precision, Justice Saylor described the nuanced interplay of the two standards as follows:

Petitioners contend that the Board's alleged failure to act as a "prudent man" in awarding the Pittsburgh license constituted an error of law. The majority rejects this claim by stating that the Gaming Act's requirement that the Board use the prudent man standard has no effect upon the review that this Court must undertake in determining whether the Board erred in the award of a gaming license. It would appear, however, that if it were evident that the Board failed to apply such a standard as required by statute, this would constitute an error of law, thus providing possible grounds for reversal. *See* 4 Pa.C.S. § 1204 (stating that this Court must affirm the Board's order unless it finds, *inter alia*, that the Board committed an error of law). Under the facts of this case, moreover, Majestic Star's troubled financial history does raise a legitimate question as to whether a "prudent man" would have selected PITG over its competitors for licensure. Still, as the majority points out, the record contains evidence of some positive indicators. For example, the financial suitability task force found that PITG had the resources to build its casino, and the Board determined that the project would be very profitable. Therefore, given this Court's highly deferential review as prescribed by the Legislature, I must ultimately conclude that the Board's actions did not constitute reversible error under the prudent man standard.

927 A.2d at 250 (Saylor, J., concurring) (internal citations omitted). Justice Baer's concurrence stated that he agreed with Justice Saylor's view regarding the prudent man rule but otherwise joined the Majority Opinion. This author also wrote separately, in dissent, agreeing with Justice Saylor's discussion of the prudent man rule in the context of our review of the Board's actions, but ultimately concluding that application of that standard to economic issues affecting applicant Majestic Star, as well as the Board's failure "to conduct any of its deliberations in public, or to allow for the equivalent of a post-verdict procedure," warranted a remand to the Board for reconsideration. 927 A.2d at 252 (Castille, J., dissenting).

A review of the separate opinions in *Station Square* makes clear that a majority of the Court expressed the view that the prudent man rule indeed governs the Board's conduct in determining financial suitability of a slots license applicant, pursuant to 4 Pa.C.S. § 1201(h.2). Ultimately, six members of the Court also concluded that, whether or not the rule applied, the Board's decision there should be affirmed. 927 A.2d at 250–252. For purposes of review here, and to avoid the tension that resulted from the separate decisions in *Station Square*, we will consider the Board's decision within the context of its members' duties as fiduciaries for the Commonwealth who must act prudently. Viewing the matter in this light, we conclude that the Board did not err when it determined that Woodlands was financially suitable for slots gaming licensure.

First, we consider appellant's argument that the Board did not act prudently when it determined that Woodlands was financially suitable, in light of record evidence that Woodlands will generate the least amount of gaming revenue among the applicants, that its revenue projections are flawed, and that it will cannibalize revenue from existing Pennsylvania gaming facilities. On this issue, the Act provides, in relevant part:

**Applicant financial information.**—The board shall require each applicant for a slot machine license to produce the information, documentation and assurances concerning financial background and resources as the board deems necessary to establish by clear and convincing evidence the financial stability, integrity and responsibility of the applicant, its affiliate, intermediary, subsidiary or holding company, including, but not limited to, bank references, business and personal income and disbursement schedules, tax returns and other reports filed with governmental agencies, and business and personal accounting and check records and ledgers. In addition, each applicant shall in writing authorize the examination of all bank accounts and records as may be deemed necessary by the board.

4 Pa.C.S. § 1313(a). The Board concluded that "Woodlands has been investigated for financial fitness and nothing finan-

cially material has been found that would indicate that the applicant or its principals are not financially stable at this time." Adjudication, 48. Further, the Board stated that it was satisfied, on the basis of representations by Woodlands and a careful investigation by the FIU, "that Woodlands is likely to maintain a financially successful, viable, and efficient business operation which will maintain a steady level and growth of revenue." *Id.* at 49. *See* 4 Pa.C.S § 1313(e) (relating to applicant's operational viability).

With regard to revenue projections, the Board acknowledged the relatively low amount projected by Woodlands in comparison to the projections offered by the other applicants ($68.4 million projection compared to Penn Harris's $75.8 million projection, appellant's $83 million projection, and Bushkill's $107 million projection). However, the Board weighed that evidence within the context of the new, "non-cannibalized" revenue potential from the extensive out-of-state clientele of Woodlands. *See supra* at 36–37. We find no imprudence or error in the Board's consideration. The question, as to this challenge at least, is not the comparative suitability of Woodlands, but its absolute suitability, as measured by a prudent man standard. We recognize that the other applicants here might also be financially suitable for licensure, or even more so than Woodlands on the measure of revenue projection (itself an uncertain and subjective endeavor), but this does not prove the unsuitability of Woodlands or disqualify that applicant. As long as Woodlands was properly found to be financially suitable under the Act, the fact that other applicants might have been stronger candidates on this one factor does not lead inexorably to the conclusion that the Board erred in granting the slots license to Woodlands. *Cf. Station Square,* 927 A.2d at 245 (Board may consider quality of facility in determining which applicant receives slots license, but Act does not impose burden on applicant to show by clear and convincing evidence that its proposed facility is "the best quality"). Appellant's comparative argument does not prove conclusively that Woodlands was financially unsuitable.

In addition, appellant questions the close relationship of Woodlands to 84 Lumber, which appellant argues is financially unstable. 84 Lumber is not an owner of Woodlands, but both Woodlands and 84 Lumber are owned by the 2001 Magerko Trust. The record indicates that, in the past, the 2001 Trust obtained a line of credit in order to provide loans to 84 Lumber. However, the BIE sought and received information regarding the ability of the owners to satisfy the letter of credit if necessary without implicating Woodlands, and determined that, at the time of the suitability hearings in this case, there were no outstanding loans to 84 Lumber relative to this line of credit. Further details about 84 Lumber's financial stability were revealed in a confidential "Category 3 Background Investigation and Suitability Report," and also during a closed executive session held by the Board in order to receive testimony about the finances of the privately held company, as well as sensitive character issues raised relating to its founder, and the grantor of the 2001 Trust, Joseph Hardy. Testimony revealed information such as corporate business and management agreements, ownership details, leases, and trust documents related to 84 Lumber, Woodlands, Nemacolin Woodlands, the 2001 Trust and other principals of these entities. N.T. 11/17/10, 1–49. Based on this information, the Board concluded that any alleged financial instability of 84 Lumber would not undermine the financial suitability of the proposed Woodlands gaming facility. Appellant has articulated no persuasive ground upon which we can determine that this conclusion was reached imprudently, or that it represented an error of law, or an arbitrary and capricious disregard of evidence.

With regard to appellant's complaint concerning the venue provided by the Board for receiving this financial information, as we have noted above, closed executive sessions are authorized under the Sunshine Law, and are also permissible where necessary under the Act. *See* 65 Pa.C.S. § 708(a)(5) (executive session authorized to review and discuss agency business which, if conducted in public, would violate lawful privilege or lead to disclosure of information or confidentiality protected

by law). Moreover, any objection to the Board's utilization of this procedure is waived in the absence of a timely objection. *See* 58 Pa.Code § 441a.7(t) (any license applicant may raise objection to conduct of hearing or process of Board by means of written objection filed no later than two business days after action or event giving rise to objection; objection not raised as provided will be deemed waived). Appellant apparently did not have advance notice of the closed executive session, which took place on November 17, 2010, and at which the Board considered the aforementioned confidential character and financial background issues. However, the Board did make an announcement at the start of the public hearing on the Woodlands application, which occurred later that same day, that a closed session had just taken place. N.T. 11/17/10, 6; R.R. 1239a. No timely objections to that procedure were lodged. Instead, appellant first raised this particular issue in its motion for reconsideration filed on June 6, 2011. Accordingly, the claim is waived.

### 2. *Suitability of Character*

■ With regard to suitability of an applicant's character, the Act provides, in relevant part:

Every application for a slot machine license shall include such information, documentation and assurances as may be required to establish by clear and convincing evidence the applicant's suitability, including good character, honesty and integrity. Information shall include, without limitation, information pertaining to family, habits, character, reputation, criminal history background, business activities, financial affairs and business, professional and personal associates, covering at least the ten-year period immediately preceding the filing date of the application.

4 Pa.C.S. § 1310(a)(1). The purpose of the requirement is to support the General Assembly's "special concern" that gaming in the Commonwealth "not be perceived as corrupt." *Pocono Manor*, 927 A.2d at 228.

■ In this case, the Board's BIE conducted a background investigation which did not reveal "any information that would

indicate that Woodlands or any of its affiliates, owners, or principals is of unsuitable character." The investigation also did not reveal "information concerning bankruptcies, civil lawsuits or judgments, criminal convictions, past activities or business practices, business associates or dealings or any other information concerning the honesty, integrity, family, habits or reputation that would prohibit licensure of Woodlands or its principals." Adjudication, 55. *See* 4 Pa.C.S. § 1310(a)-(b). Appellant challenges this finding as having been made in capricious disregard of the evidence of record. Appellant claims that the Board's investigation into the backgrounds of several Woodlands principals was inadequate, and failed to reveal various problems that should have led the Board to conclude that Woodlands was unsuitable for licensure under the Act.

While much of the information relevant to this claim is confidential under the Act, and has been provided to the Court under seal as stated, we have reviewed the relevant materials and we can fully discuss and analyze the legal claim in a general manner. *See Pocono Manor,* 927 A.2d at 228. Our review of the record, including portions that the parties stipulated to seal, reveals that the investigation by the Board's BIE delved into various personal matters as authorized by the Act. Appellant refers to allegations of wrongdoing by a principal of Woodlands, specifically Joseph Hardy, the crux of which was determined to be unsupported, and all records of the alleged incident were expunged. No criminal prosecution was pursued and no conviction resulted. The Act authorizes that certain information of this kind remain confidential, but that the Board should still consider it in making its licensing determinations. 4 Pa.C.S. § 1206(f). The BIE's investigation produced information and documents that were considered by the Board, together with statements from counsel and testimony from Hardy himself, as well as questioning by Board members, during a closed executive session. The Board was apparently satisfied with the explanations provided, and the timeline of relevant events, and thus accepted BIE's conclusion that Woodlands and its principals were suitable for

licensure under the Act. *See, e.g., Pocono Manor,* 927 A.2d at 230 (Board carefully considered BIE's report on character suitability by conducting confidential executive session where Mount Airy principal Louis DeNaples was questioned, and counsel for BIE and applicant were present to respond; BIE counsel concluded there was no issue to preclude licensure; held, Board did not capriciously disregard evidence of record).

We find neither a violation of the "prudent man rule," 4 Pa.C.S. § 1201(h.2), nor a capricious disregard of evidence in the Board's determination of the suitability of Woodlands for Category 3 licensure under the Act. The Act requires that the Board be persuaded of an applicant's suitability by clear and convincing evidence, but not that the Board "leave no stone unturned," as argued by appellant. *See* 4 Pa.C.S. § 1310(a) (applicant must show by clear and convincing evidence the applicant's suitability, including good character, honesty and integrity). We hold that the Board did not err in this regard.

### Conclusion

We have no doubt that there may have been other applicants for this remaining Category 3 license, including appellant, whose facilities may have been appropriate for the award of a license. Our task, however, is not to determine for ourselves which of the facilities was the best one, but instead to pass upon the specific claims raised, under the standard of review established by the Act. For the foregoing reasons, finding no error warranting relief, we affirm the Board's Order and Adjudication dated May 20, 2011, which awarded a Category 3 slot machine license to Woodlands.

Order affirmed.

Justice ORIE MELVIN did not participate in the decision of this case.

Justice EAKIN and McCAFFERY join the opinion.

Justice SAYLOR joins the opinion except for Part A of the discussion, as to which he concurs in the result.

Justice BAER files a concurring and dissenting opinion in which Justice TODD joins.

Justice BAER, concurring and dissenting.

While I join nearly all of the reasoning of the thorough majority opinion, I am compelled to dissent from sub-part F(2), "Suitability of Character," and thus from the ultimate decision affirming the Gaming Control Board's ("Board") grant of a Category 3 slot machine license to Woodlands Fayette, LLC ("Woodlands").

The part to which I dissent involves the confidential, sealed portion of the record. As I am able to discuss the legal claims involved in general terms, as does the Majority Opinion, I will not spread information the Board deemed confidential on the public record. Appellant Mason–Dixon essentially asserts that the Board capriciously disregarded evidence of potential criminal conduct when it concluded that the Woodlands' principals demonstrated character suitability by clear and convincing evidence as required by 4 Pa.C.S. § 1310(a).[1] As described by the Majority, Appellant "refers to allegations of wrongdoing by a principal of Woodlands, specifically Joseph Hardy, the crux of which was determined to be unsupported, and all records of the alleged incident were expunged. No criminal prosecution was pursued and no conviction resulted." Maj. Op. at 63, 52 A.3d at 1113. Crucially, however, the Majority fails to discuss the allegation that a state trooper associated with the Woodlands' principals attempted to interfere with the investigation of the criminal complaint against Hardy.

My review of the Board's consideration of these allegations is colored by my reading of the report issued by the Thirty–First Statewide Investigating Grand Jury, filed May 19, 2011,

---

1. § 1310. Slot machine license application character requirements

(a) Application.—

(1) Every application for a slot machine license shall include such information, documentation and assurances as may be required to establish by clear and convincing evidence the applicant's suitability, including good character, honesty and integrity. Information shall include, without limitation, information pertaining to family, habits, character, reputation, criminal history background, business activities, financial affairs and business, professional and personal associates, covering at least the ten-year period immediately preceding the filing date of the application.

4 Pa.C.S. § 1310(a)(1).

and released to the public on May 24, 2011. While the Grand Jury Report does not relate specifically to the licensing decision in this case, the report nonetheless provides insight into the short-comings of the Board's procedures generally, emphasizing that the specific cases discussed were merely "the best examples of problems and failures that extended throughout the application and licensing process in all the license categories." Grand Jury Report No. 1 ("GJR") at 38. Moreover, some of the most serious criticisms leveled against the Board involved the process of reviewing the suitability of applicants' principals, which is my primary concern in the case at bar.

Specifically, the Grand Jury found that "the Board failed to carefully evaluate several applicants' suitability and its own administrative practices placed the burden of establishing an applicant's unsuitability beyond all doubt squarely on the Bureau of Investigation and Enforcement" ("BIE") in direct contrast to the Gaming Act's requirement that the applicant prove suitability by clear and convincing evidence. *Id.* at 23; *see also* 4 Pa.C.S. § 1310(a). Particularly concerning in light of the issues presented in this case, the Grand Jury concluded:

[N]umerous investigators testified or provided information regarding their concerns that they were prevented from fully investigating and pursuing legitimate concerns regarding an applicant's character. Investigators also detailed how information they acquired was not adequately presented to the Board in the final suitability reports prepared by the Bureau of Licensing, and the applicant's burden of establishing good character by clear and convincing evidence was shifted to the investigators. This created a huge loophole in the thoroughness and accuracy of the BIE information getting to the Board, especially areas of concern found throughout BIE investigations.

GJR at 39–40; *see also id.* at 41 ("Despite their best efforts, [investigators] were instructed not to conduct particular interviews, were prevented from requesting additional information from the applicant, and ultimately reliable and verified information was not presented to the Board in the final suitability

report."). In discussing why certain investigatory information was removed from reports presented to the Board, the Chief Enforcement Counsel to the Board explained that "the goal with regard to the suitability reports was to secure stipulation from the other side, from the applicant, as to its admissibility and making it part of the record." *Id.* at 57.[2] If a stipulation was not secured, the investigators had to demonstrate absolute proof of the questioned piece of information for it to be included in the final report to the Board. The Grand Jury observed that the BIE seemed more concerned with the sensitivity of the applicant rather than with investigating the merits of the allegations, despite the Gaming Act's placement of the burden on the applicant to establish its suitability by clear and convincing evidence. *Id.* at 57.

I believe this Court must consider the allegations raised in this case in light of the disturbing criticisms made by the Grand Jury concerning the Board's character suitability review process. Specifically, Mason–Dixon alleges that the Board inadequately investigated the allegations against the Woodlands' principals during an executive session in November 2010 regarding the criminal complaint against Mr. Hardy and the allegation of interference with the criminal investigation involving that complaint. My review of the closed executive session confirms Mason–Dixon's concerns in regard to the interference allegation. It appears that at the Board's executive session the representative of the Office of Enforcement Counsel ("OEC") relied exclusively on assertions of the Woodlands' principals in affidavits, very brief testimony, and on the assumption that the fear of other criminal prosecution was sufficient to protect against the principals perjuring themselves before the Board. It is not clear whether the OEC or the BIE attempted to contact anyone other than the Woodlands' principals. Given the Grand Jury's findings that the investigators were often prevented from performing thorough investigations and that the information they did gather was not always passed on to the Board, I am particularly disturbed

2. Indeed, the report quotes the Chief Enforcement Counsel as saying that "it's our job to take people and companies that are unsuitable and make them suitable." *Id.* at 45.

by the cursory investigation into alleged interference with a criminal investigation.

Notwithstanding BIE's seemingly obvious failure to investigate fully the allegations in this case, the record reveals that the Board accepted BIE's investigation as sufficient. I find that conclusion is not supported by the current record, especially considering that the Gaming Act requires the applicant to prove suitability by clear and convincing evidence. *See* 4 Pa.C.S. § 1310(a). Even if it is eventually determined that the principals did not interfere with the criminal investigation, the Board must base its conclusion of character suitability on more than self-serving affidavits, very brief testimony, and the belief that if the parties were lying they would have more to worry about than the denial of a gaming license. While I recognize that the Gaming Act provides for confidentiality of information submitted by applicants or obtained by the BIE or the Board for purposes of character suitability review, I nonetheless believe that such confidentiality places a duty on the Board to probe and assess the accuracy of this information that is not otherwise subject to public scrutiny. 4 Pa.C.S. § 1206(f), 1310(a). The Board cannot act as a rubber stamp for character suitability but must instead conduct a thorough and searching inquiry to determine whether an applicant has proven its principal's character suitability by clear and convincing evidence.

I find the Board's review in this case to be a wholly unsatisfactory protection of the taxpayers of Pennsylvania from concerns that potential holders of a gaming license might attempt to influence criminal investigations in the future. The absence of a full investigation and inquiry is particularly concerning given that two former Pennsylvania State Police troopers brought a lawsuit against the State Police alleging that they were subject to discriminatory and illegal employment practices in retaliation for their reporting and investigation of the allegation that the state trooper associated with the Woodlands' principals attempted to interfere with the Hardy criminal investigation. The State Police settled this lawsuit for $675,000, which in my view, lends credence to the allega-

tion that some individuals were attempting to benefit Mr. Hardy and the Woodlands by interfering with the police investigation.

While the Majority finds neither a violation of the prudent man rule nor a capricious disregard of the evidence, I am unable to agree. We have no ability to know what was investigated by the BIE or what was found by the investigators and not turned over to the Board, because the Board did not ask the necessary questions to determine the suitability by clear and convincing evidence. Accordingly, I dissent from the affirmance of the grant of the Category 3 slot machine license to Woodlands Fayette, LLC. Instead, I would remand for a proper investigation into the allegations against the principals in this case. I emphasize, however, that I make no determination regarding the ultimate character suitability, leaving that determination, at least in the first instance, to the Board following sufficient investigation and inquiry.

Justice TODD joins this opinion.