**[J-59-2015 and J-60-2015]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | |
|---|---|
| SUGARHOUSE HSP GAMING, LP, | : No. 175 EM 2014 |
| | : |
| Petitioner | : Appeal from the Pennsylvania Gaming |
| | : Control Board's November 18, 2014 Order |
| | : granting Stadium Casino, LLC's |
| v. | : Application for Licensure as a Category 2 |
| | : Slot Machine Licensee in the City of |
| | : Philadelphia |
| PENNSYLVANIA GAMING CONTROL | : |
| BOARD, | : |
| | : SUBMITTED:  August 27, 2015 |
| Respondent | : |
| | : |
| STADIUM CASINO, LLC, | : |
| | : |
| Intervenor | : |

| | |
|---|---|
| MARKET EAST ASSOCIATES. LP, | : No. 176 EM 2014 |
| | : |
| Petitioner | : Appeal from the Pennsylvania Gaming |
| | : Control Board's November 18, 2014 Order |
| | : granting Stadium Casino, LLC's |
| v. | : Application for Licensure as a Category 2 |
| | : Slot Machine Licensee in the City of |
| | : Philadelphia |
| PENNSYLVANIA GAMING CONTROL | : |
| BOARD, | : SUBMITTED:  August 27, 2015 |
| | : |
| Respondent | : |
| | : |
| STADIUM CASINO, LLC, | : |
| | : |
| Intervenor | : |

## OPINION

JUSTICE TODD                                        DECIDED:  March 29, 2016

In these appeals which we have consolidated for purposes of our disposition, we review challenges raised by Petitioner SugarHouse HSP Gaming, LP ("SugarHouse")[1] — the present holder of a Category 2 slot machine license and operator of the Sugar House Casino in the City of Philadelphia — to the award by the Pennsylvania Gaming Control Board ("Board") of the last remaining Category 2 slot machine license for the City of Philadelphia to Stadium Casino, LLC ("Stadium").[2]  We also consider challenges raised by Petitioner Market East Associates ("Market East")[3] — an unsuccessful applicant for that license — to the Board's award of the license to Stadium.  After review, we affirm in part, vacate in part, and remand to the Board for further proceedings regarding the question of whether Stadium's ownership structure comports with the requirements of 4 Pa.C.S. §§ 1304(a) and 1330.

### I. Background

In July 2004, our General Assembly enacted the Pennsylvania Race Horse Development and Gaming Act ("Gaming Act"), 4 Pa.C.S. §§ 1101-1904.  In this legislation, the General Assembly established three separate classifications of slot machine licenses for which a "licensed racing entity or person" was eligible to apply. 4 Pa.C.S. § 1301.  A Category 1 license allows the holder to place and operate slot machines at a licensed racetrack facility at which pari-mutuel wagering on live

---

[1]  SugarHouse's petition for review to this Court was docketed at 175 EM 2014, J-59-2014.

[2]  Stadium was granted limited intervenor status in the licensing proceedings below and allowed to intervene for purposes of this appeal.

[3]  Market East's petition for review to this Court was docketed at 176 EM 2014, J-60-2015.

thoroughbred or harness racing takes place. A Category 2 license permits the licensee to place and operate slot machines at any facility, without requiring that the facility also be licensed to conduct thoroughbred or harness racing. Id. § 1304. A Category 3 license empowers the owner or subsidiary of the owner of a "well-established resort hotel" with 275 or more rooms to place and operate slot machines in a separate area of the hotel facility which is reserved exclusively for gaming. Id. § 1305.

With respect to Category 2 licenses, Section 1304 of the Gaming Act further provides that the Board is authorized to award not more than two Category 2 licenses within a city of the first class, i.e., Philadelphia, and not more than one Category 2 license within a city of the second class, i.e., Pittsburgh.[4] Relevant to the present matter, in 2006, the Board awarded one of the two Category 2 licenses allocated for the City of Philadelphia to SugarHouse to build and operate a casino in the City of Philadelphia. The Board awarded the second Category 2 license at that time to the organization "Foxwood's Casino Philadelphia" ("Foxwood"), but that license was subsequently revoked on December 23, 2010 because Foxwood could not secure the necessary financing to build and operate its planned casino.

Subsequently, SugarHouse encountered permitting and approval difficulties with the City of Philadelphia which delayed the commencement of construction. Gaming Board Adjudication ("Adjudication"), 11/18/14, at 118. These delays, coupled with the economic downturn in 2008 which hampered the availability of credit all over the country, prompted SugarHouse to request permission from the Board to build a smaller facility that it pledged to expand once business conditions improved. The Board granted this request in 2009, and, subsequently, in September 2010, SugarHouse

---

[4] The Category 2 license authorized for Pittsburgh was awarded by the Gaming Board to Holdings Acquisition Co., L.P., which now operates the Rivers Casino in that city.

constructed and opened an "interim" facility, which is located on the eastern side of Philadelphia near the Delaware River at 1080 North Delaware Avenue. In 2014, SugarHouse began construction on an expansion of that casino to increase both its overall size and the number of gaming offerings available for patrons. When these improvements are done, the number of slot machines at the SugarHouse casino is projected to rise to 2,200 from its current number of 1,900; the current number of presently available banked table games[5] is projected to increase from 80 to 90; and 25-30 poker tables will be added to SugarHouse's available gaming offerings.[6]

Because of the revocation of Foxwood's Category 2 license in 2010, the Board restarted the application process for that license, and it set a deadline of November 15, 2012, for receipt of applications. The Board ultimately received six applications, of which two were withdrawn. The four remaining applicants considered by the Board were submitted by Stadium, Market East, PHL Local Gaming and Tower Entertainment.[7]

In its application, Stadium proposed to convert an existing ten-story Holiday Inn, located on Packer Avenue in South Philadelphia between 10th and Darian Streets and immediately adjacent to Philadelphia's "Stadium District," where its professional sports'

---

[5]  As described by the Gaming Board: "Banked table games are those games which players wager against the house/casino[,whereas,] [n]on-banked games are the Poker style games which players wager against each other." Adjudication, 11/18/14, at 34 n.22.

[6]  While the Board's decision in this matter involved only the award of the remaining Category 2 slot machine license, and did not authorize the offering of table games, presently, the Board, in reviewing the plans submitted by the respective applicants, nevertheless considered the suitability of their proposed facilities for accommodating table games in the future in selecting the applicant which submitted the best proposal. Adjudication, 11/18/14, at 40 n.24.

[7]  PHL Local Gaming and Tower Entertainment, while unsuccessful in their applications, are not participants in the current appeal, and, thus, the Board's findings of fact and legal conclusions regarding these applicants will not be discussed herein.

venues[8] are all situated, into an integrated hotel, gaming and entertainment facility. The proposed integrated facility would feature, on multiple floors, a total of 71,500 square feet of space devoted to gaming, as well as a 2,600-space self-parking garage, a 200-room hotel, a spa, pool and fitness center, six restaurants, a concert hall seating 1,000 people, and a rooftop deck. Stadium projected that 2,013 slot machines, 92 banked table games, and 33 non-banked poker games would occupy the gaming space within the facility.

Market East's application detailed its plans to build a 17-story combination hotel and casino located in the heart of Philadelphia, in the "Center City" area, at the corner of 8th and Market Streets. This building would offer, on two floors, a total of 116,820 square feet of space for gaming containing 2,400 slot machines, 82 banked table games and 30 poker tables. Additional amenities would include six restaurants, a sports bar, various retail shops, outdoor terraces, and a 1,200-seat showroom. Market East proposed to construct underneath the hotel a parking garage holding 752 self-parking, and 1,000 valet-parking spaces.

Thereafter, the Board's Bureau of Licensing, Bureau of Investigation and Enforcement, and its Financial Investigations Unit engaged in a comprehensive investigation of each of the applicants to ensure that the principals in these entities comported with the Gaming Act's requirements that they be of good character, and that the entities themselves had adequate financial resources to build and operate the proposed facilities in the manner described in their applications. In 2013, after these investigations were complete, the Board conducted a series of open hearings at which

---

[8] These include Citizen Bank Park, home of the Philadelphia Phillies baseball club, Lincoln Financial Field, home of the Philadelphia Eagles football team, and the Wells Fargo Center — home of the Philadelphia Flyers hockey team, and the Seventy-Sixers, Philadelphia's basketball team.

members of the public were permitted to testify. Additionally, at one of the public hearings, the City of Philadelphia was afforded the right to present testimony on its behalf from city officials, as well as testimony from a consulting firm the city had retained regarding its evaluation of the economic impact each of the proposed casinos would have, as well as its comparison of the potential revenues which would be generated by their operation.

The Board subsequently scheduled formal public suitability hearings to consider each license application individually, at which an applicant was allowed to present formal testimony in support of its own application, and also to compare the merits of its plans for construction and operation of a casino to those put forth by the other applicants. Prior to the commencement of those hearings, SugarHouse and two other groups filed petitions to intervene.[9]

The Board's rules governing intervention in these individual licensing hearings permit a party to petition the Gaming Board for intervention "if the person has an interest in the proceeding which is substantial, direct and immediate and if the interest is not adequately represented in a licensing hearing." 58 Pa. Code § 441a.7(z)(2). In its petition, SugarHouse sought intervention based, first, on the assertion that if another applicant was permitted to operate in Philadelphia it would be "a direct competitor" which would "dilute" the gaming market, thereby causing it to "suffer direct competitive and economic harm." SugarHouse Petition to Intervene, 12/16/13, at 4. SugarHouse also sought intervention on the basis of its claim that an award of a Category 2 license

---

[9] The other groups were Eastern Pennsylvania Citizens Against Gambling and a group jointly comprised of the Congregation Rodeph Shalom, the Mathematics, Civics and Science Charter School, and Friends Select School, none of which are participating in the current appeal.

to Stadium and other applicants would violate Section 1304 of the Gaming Act[10] because they allegedly were "owners or operators" of other Pennsylvania Category 1 facilities. Id. at 9-10. Finally, SugarHouse requested intervention on the grounds that "affiliates, owners, or financial backers" of Stadium, Market East, and other applicants owned or had a financial interest in other existing licensed gaming entities which exceeded the 33.3% statutory limit allowed by Section 1330 of the Gaming Act.[11] Id. at 10-11. SugarHouse contended that neither the Board nor any of the other applicants had the same economic and social interests, nor could the Board or the other applicants represent its interests in the licensing proceeding.

The Board granted SugarHouse's petition, in part, "limited . . . to the issues surrounding the Philadelphia gaming market and the impact a second Philadelphia casino may have on it." Board Order, 1/8/14, at 1. However, the Board denied SugarHouse intervention on the remaining issues raised in its petition regarding "issues of compliance by applicants with Sections 1304 and 1330," noting that SugarHouse's "interests in those areas are adequately represented by the [Board's] Office of Enforcement Counsel [("OEC")]." Id. SugarHouse did not attempt to appeal that portion of the Board's order at that time, but, instead, raises challenges to the Board's limitation of its intervention in the instant appeal. At each of the individual licensing hearings conducted by the Board from January 28-30, 2014, SugarHouse presented evidence only on the issue of the potential market saturation and cannibalization of revenues

---

[10] Section 1304 allows a person to apply for a Category 2 slot machine license "if the applicant, its affiliate, intermediary, subsidiary or holding company is not otherwise eligible to apply for a Category 1 license." 4 Pa.C.S. § 1304.

[11] Section 1330 prohibits a "slot machine licensee, its affiliate, intermediary, subsidiary or holding company" from "possess[ing] an ownership or financial interest that is greater than 33.3% of another slot machine licensee or person eligible to apply for a Category 1 license, its affiliate, intermediary, subsidiary or holding company." 4 Pa.C.S. § 1330.

which it contended would take place as the result of the opening of a second casino in Philadelphia.

After the individual licensing hearings concluded, all parties were given the chance to file written objections to matters that transpired during the hearings. No post-hearing objections were filed by any party, although each of the applicants and intervenors filed post-hearing briefs. On February 5, 2014, Stadium filed a "Petition to Reopen the Record" to allow it to amend its application to include a revised ownership structure in order to address questions raised by the Board at Stadium's suitability hearing regarding whether the ownership structure of Stadium comported with Section 1330. This petition was not opposed by the OEC, or by any of the parties or intervenors, and it was granted by the Board.

As relevant to the issues involving Section 1330 of the Gaming Act, which are contested by the parties in this appeal, the Petition to Reopen the Record concerned the ownership interests of Watche Manoukian in a corporation and a limited partnership, both of which entities were part owners of Stadium. At the time of Stadium's initial application in 2012, Manoukian was the president, treasurer and director of Sterling Fiduciary Services, Inc. ("Sterling Fiduciary"), a corporation which acted as trustee for the Sterling Investors Trust. Sterling Investors Trust was the sole owner of Stadium Casino Investors, L.L.C., that, in turn, owned 50% of Stadium.[12] The other 50% of Stadium was then, and was at the time of the Board proceedings below, held by an ownership group from Maryland — Stadium Casino Baltimore Investors, LLC ("Cordish

---

[12] Diagrams of Stadium's pre- and post-licensure ownership structures have been included as an exhibit to the confidential brief of SugarHouse. See SugarHouse Confidential Brief, Appendix 4.

Group").[13] In its amended application, Stadium presented a revised governance structure of Sterling Fiduciary in which Manoukian relinquished his roles as president, treasurer and director of that corporation and, instead, took a 28% stock interest in it, assigning the remaining 72% of the corporation's stock to other of his family members.

Stadium's original application contemplated that, if it were ultimately awarded the Category 2 license, Sterling Investors Trust would reduce its ownership interest in Stadium to 34%, and a company known as Greenwood Racing Inc. ("Greenwood") would acquire a 66% interest in Stadium Casino Investors. Manoukian owns 85% of Greenwood, which is also the holding company that owns Parx Casino — a Category 1 slot machine licensee — located in Bensalem, Bucks County.

Because of the prohibition in Section 1330 of the Gaming Act against a slot machine licensee possessing "an ownership or financial interest . . . greater than 33.3% of another slot machine licensee," the Board considered the question of whether Manoukian's ownership interests in both Greenwood and Stadium would violate that prohibition if Stadium was awarded the Category 2 license. The Board found that they would not, as it determined that, post-license, Manoukian would own only 28.3% of Stadium through his ownership of Greenwood.[14] Because of the alteration in the ownership structure of Sterling Fiduciary, which left Manoukian a minority shareholder in that company, the Board attributed none of Sterling Fiduciary's net ownership interest in Stadium to Manoukian; however, it noted that, even if it were to consider Manoukian's 28% ownership of Sterling Fiduciary's stock to constitute an indirect ownership interest

---

[13] The principal ownership interest in this group is held by Jonathan Cordish, with the remainder of the ownership interest held by other Cordish family members.

[14] The Board arrived at this figure using the following computation: Manoukian owns 85.84% of Greenwood (.8584), which in turn owns 66% (.66) of Stadium Casino Investors L.L.C. which itself owns 50% (.50) of Stadium. Thus, (.8584) x (.66) x (.50) yields a net ownership interest for Manoukian of .283, or 28.3%.

by Manoukian in Stadium, then that interest would only amount to an additional 4.8%,[15] which, when added to his other 28.3% ownership in Stadium through Greenwood, still left Manoukian's total ownership interest in Stadium below the 33.3% limit imposed by Section 1330. Adjudication at 80-81.

On February 26, 2014, the Board entertained closing arguments by Market East and other applicants, as well as SugarHouse; however, Stadium presented no argument. After considering all of the evidence of record, on November 18, 2014, the Board voted 7-0 at an open public hearing to award the Category 2 license to Stadium. The Board explained that its selection of Stadium was based on the following factors: (1) the Board considered Stadium's hotel/casino to be "right-sized" for the Philadelphia gaming market since it would not be "overbuilt"; (2) the location of the hotel/casino, in Philadelphia's Stadium District bordering the parking lots of the stadiums, and, hence, apart from large residential populations, was advantageous in that it was accessible by the nearly 8 million annual visitors to the sports' stadiums, and its design, as a modern streetscape, would fit well within the overall architectural scheme of the area; (3) the geographic location of the hotel/casino relative to other existing casinos would be of sufficient distance so as to create a buffer between them; (4) the hotel/casino would be accessible by automobile from two major interstate highways — I-76 and I-95 — as well as by a nearby subway stop for those desirous of taking mass transportation from the Center City region of Philadelphia; (5) there was minimal public opposition to the proposed location, and the concerns of residents who lived in a neighborhood near the

---

[15] This 4.8% figure represents the product of the percent of stock Manoukian owned in Sterling Fiduciary (.28), multiplied by that trustee's legal ownership of Sterling Investors Trust (1.00), multiplied by the percentage ownership interest of Sterling Investors Trust in Stadium Casino Investors (.34), multiplied by the ownership interest of Stadium Casino Investors in Stadium (.50), i.e., (.28)(1.00)(.34)(.50)=(.048), or 4.8%.

corner of Packer Avenue and Broad Streets regarding increased traffic on game days would be alleviated by Stadium's commitment to entirely finance the construction of an additional on-ramp to I-76 which would divert some of the traffic flow, as well as its building of the aforementioned parking garage which would absorb the increased demands for parking on days in which sporting events were held; (6) Greenwood had a proven track record in the casino industry by making Parx a top producing casino, while the Cordish Group had a similar successful background in the broader entertainment industry through the operation of its Live! facilities, one of which — X-Finity Live! — was already a popular entertainment destination located in the Stadium District; and (7) the ownership group of Stadium had the capacity to self-finance the construction of the casino and was not dependent on private financing through the credit market; thus, its ownership would not incur excessive debt which would hinder either its ability to be developed as proposed, or its ability to compete with other casinos in the Philadelphia-area gaming market. Adjudication at 112-16.

## II. Analysis

Both SugarHouse and Market East filed petitions for review with this Court raising the following issues, which, with respect to SugarHouse's petition, we have reordered for ease of discussion.[16]

***Appeal of SugarHouse at 175 EM 2014, J-59-2015:***

---

[16]Our Court has exclusive jurisdiction over these appeals pursuant to Section 1204 of the Gaming Act, which provides:

> The Supreme Court of Pennsylvania shall be vested with exclusive appellate jurisdiction to consider appeals of any final order, determination or decision of the board involving the approval, issuance, denial or conditioning of a slot machine license or the award, denial or conditioning of a table game operation certificate.

4 Pa.C.S. § 1204.

1. Did the Board err as a matter of law, or at the very least, act arbitrarily and with a capricious disregard of the evidence, when it failed to grant in full SugarHouse's Petition to Intervene on the grounds that SugarHouse's interests in ensuring the applicants' compliance with the Gaming Act would be adequately represented by the Board's enforcement counsel?

2. Did the Board err as a matter of law, or at the very least, act arbitrarily and with a capricious disregard of the evidence, when it awarded a license to Stadium without considering, as required by Section 1102(5) of the Gaming Act and its own regulation (58 Pa. Code § 421a.5), whether the award would result in the undue concentration of economic opportunities and control of licensed facilities?

3. Did the Board err as a matter of law, or at the very least, act arbitrarily and with a capricious disregard of the evidence, when its award to Stadium violates the eligibility requirements of Section 1304 of the Gaming Act prohibiting dual ownership and control of both a Category 1 licensee and a Category 2 licensee?

4. Did the Board err as a matter of law, or at the very least, act arbitrarily and with a capricious disregard of the evidence, when its award to Stadium allowed Manoukian and his affiliates to own or control more than 33.3% of a second casino in Pennsylvania?

SugarHouse Brief (J-59-2015) at 5-6.

***Appeal of Market East at 176 EM 2014, J-60-2015:***

1. Did the Board commit an error of law in granting the application of Stadium for a Category 2 Slot Machine License in the City of Philadelphia, Pennsylvania when it did not consider the likelihood of possible monopolization and/or undue concentration of economic opportunities and control of licensed gaming facilities as required by section 1102(5) of the Gaming Act, 4 Pa.C.S. § 1102(5), and the Board's own regulations found at 58 Pa. Code § 421a.5.?

2. Did the Board commit an error of law in granting the application of Stadium for a Category 2 Slot Machine License in the City of Philadelphia, Pennsylvania because granting the license to Stadium violates section 1304(a)(1) of the Gaming Act, 4 Pa.C.S. § 1304, which makes Stadium ineligible for a Category 2 license because an entity is only eligible to apply for a Category 2 license if the applicant, its affiliate, intermediary, subsidiary or holding company is not otherwise eligible to apply for a Category 1 license?

3. Did the Board commit an error of law in granting the application of Stadium for a Category 2 Slot Machine License in the City of Philadelphia, Pennsylvania because granting the license to Stadium violates section 1330 of the Gaming Act, 4 Pa.C.S. § 1330, which prohibits a slot machine licensee, its affiliate, intermediary, subsidiary, or holding company from possessing an ownership or financial interest greater than 33.3% of another slot machine licensee or person eligible to apply for a Category 1 license, its affiliate, intermediary, subsidiary, or holding company?

4. Was the Board's decision in granting the application of Stadium for a Category 2 Slot Machine License in the City of Philadelphia, Pennsylvania arbitrary and the result of a capricious disregard of the evidence when it ignored the considerable strengths of Market East's application?

Market East Brief (J-60-2015) at 9-11.

In these appeals, the Board is the Respondent. However, Stadium intervened in this appeal, as a matter of right, pursuant to Pa.R.A.P. 1531.[17]

### *A. Appeal of SugarHouse at 175 EM 2014, J-59-2015*

---

[17]  This rule provides in relevant part:
> (**a) Appellate jurisdiction petition for review proceedings.** A party to a proceeding before a government unit that resulted in a quasijudicial order may intervene as of right in a proceeding under this chapter relating to such order by filing a notice of intervention (with proof of service on all parties to the matter) with the prothonotary of the appellate court within 30 days after notice of the filing of the petition for review.

Pa.R.A.P. 1531.

In its first issue, SugarHouse claims that the Board's decision to deny it leave to intervene in this proceeding on issues other than market saturation constituted an error of law and an abuse of discretion.[18] SugarHouse argues that it had the requisite direct,

[18] Stadium argues that this issue is waived since SugarHouse did not appeal the Board's order as a collateral order at the time of its entry. Specifically, Stadium contends that the order of the Board denying the intervention of SugarHouse as to "issues of compliance with Sections 1304 and 1330" was a collateral order since it meets all three criteria established by Rule of Appellate Procedure 313(b) which define such an order: (1) it is "separable from and collateral to the main cause of action"; (2) it involves a right "too important to be denied review;" and (3) the question presented is such that if review is "postponed until final judgment" in the case, the claim will be "irreparably lost." Stadium Brief (J-59-2015) at 8 (quoting Pa.R.A.P. 313(b)). Stadium reasons that, because the order limiting SugarHouse's intervention was collateral, under our Court's decision of In re Barnes Foundation, 871 A.2d 792 (Pa. 2005) (holding that individuals denied intervention in Orphan's Court proceeding regarding restructuring of a charitable trust could not appeal from final order approving the restructuring, but, rather, were required to appeal from order denying intervention, as their lack of party status deprived them of standing to appeal), it was immediately appealable within 30 days of the date of its entry, and SugarHouse's failure to take an appeal within that time period deprived our Court of jurisdiction to presently consider its appeal.

SugarHouse responds that there is no provision of the Gaming Act which allows for a collateral appeal arising out of licensing proceedings. SugarHouse argues that Section 1204 of the Gaming Act governing appeals from license application proceedings before the Gaming Board permits only an appeal from a "final order," in what SugarHouse contends was a deliberate restriction on appellate review in order to further the legislative objective of providing a streamlined appeals process for review of licensing decisions. SugarHouse Reply Brief at 23 (quoting 4 Pa.C.S. § 1204). Additionally, SugarHouse maintains that, because the Gaming Board's order granted it limited intervention, it was not subject to immediate review, citing as support the decision of the United States Supreme Court in Stringfellow v. Concerned Neighbors in Action, 480 U.S. 370 (1987) (order granting limited intervention, and placing conditions on scope of intervention, was reviewable in an appeal from the final judgment; hence, interlocutory review was not permitted under the collateral order doctrine). SugarHouse contends that Barnes does not compel a different result, as that case involved an appeal from a court of common pleas decision, and the appellant in that case was denied intervention completely.

Given that this matter is not a civil proceeding, as in Barnes, where intervention is governed by our rules of civil procedure, but, instead, intervention in this matter was sought under the Board's unique procedural rules, and since the Board has taken no (continued…)

substantial, and immediate interest justifying its intervention, based on its averment that it would be harmed by the alleged unfair economic advantage in the competitive Philadelphia gaming market that Stadium would have gained by being awarded a license without complying with the licensure requirements of the Gaming Act. SugarHouse contends that the Board erred in determining that its interests could be adequately represented by the OEC since that entity had already submitted a suitability report prior to SugarHouse's filing of its petition to intervene indicating that Stadium met the statutory requirements for licensure, and it refused to take a position before the Board regarding whether Stadium's ownership structure was in compliance with Section 1330 of the Gaming Act. SugarHouse maintains that had it been given the opportunity to intervene it would have vigorously pressed arguments regarding this issue and would have reminded "the Board of its responsibility to examine carefully the issues raised by the joint ownership of Parx and Stadium." SugarHouse Brief (J-59-2015) at 57.

The Board responds that intervention is not a matter of right, but an exercise of discretion on its part, and intervention is limited under its regulations to only those circumstances in which a party has a direct, substantial, and immediate interest in the licensing proceeding. The Board argues that SugarHouse did not have an interest with respect to issues concerning Stadium's compliance with Sections 1304 and 1330 of the Gaming Act which was any different than any other citizen who seeks to ensure compliance with the law; thus, in the Board's view, SugarHouse did not have standing to assert these issues before the Board. In any event, according to the Board, SugarHouse's claim essentially boils down to an allegation that the OEC did not present

---

(…continued)

position on this issue, we will assume, *arguendo*, that this question is reviewable in this appeal from the Board's final judgment.

the issues in the way that SugarHouse would have done, had it been granted intervenor status, and this averment was not a basis for it to be granted intervention.

The Board emphasizes that it granted SugarHouse intervention on the issue of market saturation because that issue affected its direct pecuniary interest due to the fact that the entity which was awarded the license would be a competitor of SugarHouse, and no other party had such a similar interest. However, the issues of each applicant's comportment with the statutory eligibility criteria were "exactly the interest[s] that OEC, as well as every other competing applicant/party, had in this matter." Board Brief (J-59-2015) at 25. The Board stresses that OEC did fulfill its responsibility to enforce the licensing requirements of the Gaming Act in that it investigated and reviewed the background of each applicant and made specific recommendations regarding each. The Board rejects SugarHouse's argument that because the chief counsel for the OEC took no formal position before the Board challenging the licensing structure of Stadium, the Board did not consider that issue carefully. The Board points out that, in arriving at its decision, it examined the evidentiary record fully, as was its responsibility under the Gaming Act, and, moreover, the competing license applicants — which had substantial, direct and immediate interests in ensuring that the Board considered the licensing criteria of the Gaming Act — did present arguments on this question and reminded the Board of its duty to consider all of the relevant statutory factors.

Our review of Board decisions is circumscribed by Section 1204 of the Gaming Act which mandates that our Court:

> shall affirm all final orders, determinations or decisions of the board involving the approval, issuance, denial or conditioning of a slot machine license or the award, denial or conditioning of a table game operation certificate unless it shall find that the board committed an error of law or that the order, determination or decision of the board was arbitrary and there was a capricious disregard of the evidence.

4 Pa.C.S. § 1204. Thus, "this Court's review of Board decisions is limited to determining whether the Board: (1) erred as a matter of law; or (2) acted arbitrarily and in capricious disregard of the evidence." Greenwood Gaming & Entertainment, Inc. v. Pennsylvania Gaming Control Bd., 15 A.3d 884, 886-87 (Pa. 2011). A capricious disregard will be found whenever an administrative agency engages in a "willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result." Id. However, "under the capricious disregard standard, the agency's determination is given great deference, and relief will be rarely warranted." Riverwalk Casino, LP v. Pennsylvania Gaming Control Bd., 926 A.2d 926, 929 (Pa. 2007). In applying this standard "an appellate tribunal is not to substitute its judgment for that of the lower tribunal and the standard is not to be applied in such a manner as would intrude upon the agency's fact-finding role and discretionary decision-making authority." Id. at 930 (internal quotation marks omitted).

As the Board has noted, an entity seeking intervention in slot machine licensing hearings does not have an automatic right under the Gaming Act to do so; rather, the decision to grant or deny intervention "is within the sole discretion of the Board." 58 Pa. Code § 441a.7(z). Intervention is restricted to only those persons who have "an interest in the proceeding which is substantial, direct and immediate," and, then, only when "the interest is not adequately represented in a licensing hearing." Id. § 441a.7(z)(2).

Our Court has described the essential requirements for a party's interest to be considered substantial, direct, and immediate as follows:

> A party has a substantial interest in the outcome of litigation if his interest surpasses that of all citizens in procuring obedience to the law. The interest is direct if there is a causal connection between the asserted violation and the harm complained of; it is immediate if that causal connection is not remote or speculative.

Johnson v. American Standard, 8 A.3d 318, 329 (Pa. 2010) (quoting Fumo v. City of Philadelphia, 972 A.2d 487, 496 (Pa. 2009)). Inasmuch as SugarHouse was a casino operator in Philadelphia at the time of these licensing proceedings and, as such, it would suffer financial detriment by the improper granting of a license to a competing casino within the City of Philadelphia, we agree with its contention that it had a substantial, direct, and immediate interest in the outcome of the licensing proceedings which was greater than the general interest possessed by all persons in ensuring compliance with the law.

However, we discern no error of law, or arbitrary or capricious disregard of competent evidence in the Board's determination that SugarHouse's interests in ensuring that the successful applicant would meet all of the statutory requirements set forth in the Gaming Act for the award of the license were adequately represented during the licensing hearings. The extensive evidentiary record in this matter, and the Board's comprehensive Adjudication, indicates that the Board carefully considered the question of whether Stadium's ownership structure violated Section 1304(a) and 1330 of the Gaming Act based on the evidence presented to it by OEC and other parties on this question. Indeed, the matter of Stadium's ownership structure, as presented in its original application, was specifically discussed at its licensing hearing, which prompted Stadium to present a revised ownership structure to the Board after the hearing. Adjudication at 11. SugarHouse does not identify any evidence on these questions which it was precluded from presenting to the Board during the hearings which was not otherwise considered by the Board in arriving at its decision.[19] Moreover, as evident from the record and its Adjudication, the extensive factual and legal arguments with

_____

[19] In its Petition to Intervene, SugarHouse sought to conduct discovery on this issue, but this request was denied, Adjudication at 28 n.19, and it does not challenge this denial in the present appeal.

respect to these questions were vigorously pursued before the Board by the other applicants, and continue to be pursued by Market East in this appeal; thus, we find no merit in SugarHouse's assertion that allowing it to present arguments to the Board was somehow necessary in order to remind the Board of the need for it to consider these questions. Consequently, we see no basis to disturb the Board's decision to limit SugarHouse's participation in the licensing proceedings before it to the issue of market saturation.[20] See, e.g., West Chester Area School District v. Collegium Charter School, 812 A.2d 1172, 1187 (Pa. 2002) (finding no abuse of discretion whenever the putative intervenor would not have presented additional evidence or arguments before the administrative tribunal, and its interests were represented by a party to the proceedings before the tribunal).

Given this conclusion that SugarHouse's intervention in the licensing proceedings was properly limited to the question of market saturation under the Board's rules, we do not address SugarHouse's remaining issues presented in its appeal. That is, with respect to these issues, it was not granted leave to intervene in the proceedings below, did not participate as a party in the licensing hearings with respect to those issues, and so will not be heard now.[21] See 58 Pa. Code § 494a.11(a) (specifying that "[a] **party** may appeal final orders of the Board" (emphasis added)); Society Hill Civic

---

[20] Notably, SugarHouse has abandoned the issue of market saturation in the present appeal. SugarHouse Brief (J-59-2015) at 2-3. As a result, we do not consider this question. Pa.R.A.P. 2119; Wirth v. Commonwealth, 95 A.3d 822, 837 (Pa. 2014). In addition, as no other party to this appeal raises this issue, we will not consider the arguments related to it raised in the *amicus* briefs of Delaware County and Chester Downs' Casino.

[21] We leave for another day consideration of the breadth of an intervenor's right to be heard before this Court on issues for which it was **erroneously** denied intervention before the Board.

Association v. Pennsylvania Gaming Control Board, 928 A.2d 175, 183 (Pa. 2007) (no standing to appeal from a decision of the Gaming Board by persons who were not parties below, or granted leave to intervene); cf. Appeal of Municipality of Penn Hills, 546 A.2d 50 (Pa. 1988) (recognizing the right of an administrative tribunal to limit intervention through its rules of procedure, and that scope of party's intervention before the administrative tribunal is determinative of its rights to pursue issues on appeal). Nevertheless, we note that we have carefully reviewed SugarHouse's arguments concerning these issues and have determined that they are duplicative of the arguments raised by Market East, which we address below in our discussion of its appeal.

### B. Appeal of Market East at 176 EM 2014, J-60-2015

**1. Whether, in awarding the license to Stadium, the Board failed to consider the alleged monopolization of the gaming market and/or undue concentration of economic opportunities and licensed gaming facilities, which purportedly would result?**

In its first issue, Market East contends that, in awarding the license to Stadium, the Board failed to consider the alleged monopolization of the gaming market or the undue concentration of economic opportunities and licensed gaming facilities which purportedly would result. Before considering this question, however, we must address the Board's argument that this issue was waived under Pa.R.A.P. 1551 due to Market East's failure to raise it before the Board. Market East denies that this issue was waived under this rule based on its contention that the Board had the independent duty under Section 1102(5), and its own regulations, 58 Pa. Code § 421a.5, to consider whether undue economic concentration would result from its issuance of a slot machine license. Market East further asserts that it could not have raised this issue until the Board issued its Adjudication, in which Market East contends that the Board failed to analyze this question.

Pa.R.A.P. 1551, which governs petitions for review from administrative tribunals, provides, in relevant part, that "[n]o question shall be heard or considered by the court which was not raised before the government unit except: . . . (3) Questions which the court is satisfied that the petitioner could not by the exercise of due diligence have raised before the government unit." Pa.R.A.P. 1551(a). As we noted in our decision in Station Square Gaming L.P. v. Pennsylvania Gaming Control Bd., 927 A.2d 232, 240-41 (Pa. 2007), proceedings before the Gaming Board are "sui generis" and unlike either a conventional trial in the court of common pleas, or proceedings conducted before other administrative tribunals such as unemployment or workers' compensation hearings. Thus, we stressed that, given the Board's unique procedures, in circumstances where a party did not have the opportunity to identify or raise issues to the Board, such issues will not be waived if they are raised for the first time in a petition for review. Id. at 241. Here, the nature of Market East's claim, i.e., that the Board "did not consider the likelihood of possible monopolization and/or undue concentration of economic opportunities and control of licensed gaming facilities," as required by statute and regulation, Market East Brief (J-60-2015) at 9-10, is a challenge to the Board's Adjudication in which it explicated its rationale for making its ultimate licensing decision. The Board's regulations do not permit a party to file either exceptions, or a motion for reconsideration or rehearing, after the Board's final order in licensing proceedings. See 58 Pa. Code § 494a.8(f) (expressly exempting a final order of the Board in licensing proceedings from being subject to an application for rehearing or reconsideration, and providing that challenges to a Board denial of a license are governed by 4 Pa.C.S. § 1204). As a result, the earliest possible opportunity for Market East to raise this challenge was through its petition for review; thus, we find the issue is not waived.

On the merits, Market East asserts that 58 Pa. Code § 421a.5(c) specifies that the Board, in determining whether undue concentration of economic opportunities exists, "will consider" the 11 factors enumerated therein.[22]  Market East Brief (J-60-

---

[22] Section 421a.5(c) provides:

> In determining whether the issuance or holding of a license by a person will result in undue concentration of economic opportunities and control of the licensed gaming facilities in this Commonwealth, the Board will consider the following criteria:
> (1) The percentage share of the market presently controlled by the person in each of the following categories:
> > (i) Total number of slot machine licenses available under section 1307 of the act (relating to number of slot machine licenses).
> > (ii) Total gaming floor square footage.
> > (iii) Number of slot machines and table games.
> > (iv) Gross terminal and table game revenue.
> > (v) Net terminal and table game revenue.
> > (vi) Number of persons employed by the licensee.
> (2) The estimated increase in the market share in the categories in paragraph (1) if the person is issued or permitted to hold the license.
> (3) The relative position of other persons who hold licenses, as evidenced by the market share of each person in the categories in paragraph (1).
> (4) The current and projected financial condition of the industry.
> (5) Current market conditions, including level of competition, consumer demand, market concentration, any consolidation trends in the industry and other relevant characteristics of the market.
> (6) Whether the gaming facilities held or to be held by the person have separate organizational structures or other independent obligations.
> (7) The potential impact of licensure on the projected future growth and development of the gaming industry in this Commonwealth and the growth and development of the host communities.

(continued…)

2015) at 21. It reasons that, because the Board failed to either refer to these factors, or discuss them in its Adjudication, its decision should be reversed; according to Market East, this failure evidences the Board's disregard for the legislative intent to avoid monopolization and undue economic concentration in the award of a slot machine license. Market East claims that the Board's failure to conduct such an explicit analysis is "troubling" based on what it contends are "anti[-]competitive effects" of the award of the license. Market East Brief (J-60-2015) at 22. Market East cites, as support for this contention: first, the proximity of Stadium's proposed casino to the site of the Parx Casino, which it contends are both owned by Manoukian and, thus, would have no incentive to compete against one another in the same market; and, second, the alleged competitive advantage Stadium would have over other casinos, by virtue of the access

---

(…continued)

> (8) The barriers to entry into the gaming industry, including the licensure requirements of the act, and whether the issuance or holding of a license by the person will operate as a barrier to new companies and individuals desiring to enter the market.
>
> (9) Whether the issuance or holding of the license by the person will adversely impact consumer interests, or whether the issuance or holding is likely to result in enhancing the quality and customer appeal of products and services offered by slot machine licensees to maintain or increase their respective market shares.
>
> (10) Whether a restriction on the issuance or holding of an additional license by the person is necessary to encourage and preserve competition and to prevent undue concentration of economic opportunities and control of the licensed gaming facilities.
>
> (11) Other evidence related to concentration of economic opportunities and control of the licensed gaming facilities in this Commonwealth.

58 Pa. Code § 421a.5(c).

it would have to a combined list of customers from both casinos, which it would use for marketing purposes.

The Board responds[23] by focusing on the fact that 58 Pa. Code § 421a.5(c) did not require it to engage in a protracted discussion in its Adjudication of each of the factors set forth therein; rather, in the Board's view, it is required by the text of the regulation only to consider them in its licensing decision. It contends that the evidentiary record and its Adjudication both demonstrate that it was presented with, and did, in fact, consider evidence relating to the issue of concentration of economic opportunities during the process of deciding to award the license to Stadium. The Board rejects Market East's assertion that Stadium is "another Manoukian casino," because that conclusion disregards the fact that the Cordish Group, which owns 50% of Stadium, is a new entrant into the Pennsylvania gaming market, and that it will have the greatest share of control over the Stadium casino. Board Brief (J-60-2015) at 26. Consequently, according to the Board, it is the Cordish Group, not Manoukian, that will realize the majority of the benefits of this control over the facility, its slot machines, table games, and the attendant revenue and employment opportunities which will be generated.

The Board points out that, prior to its award of a license to Stadium, SugarHouse had a slot machine monopoly in Philadelphia, even though the Gaming Act expressly contemplated that there be two such licensees, and that the mere use of the same mailing list for marketing purposes by both casinos does not, by itself, rise to the level of a violation of the regulations, particularly where other casino management companies

---

[23] While we have considered Stadium's arguments as an intervenor with respect to this and the remaining issues in these appeals, since it is the Board's adjudication of these issues that is being challenged by Market East, we focus on the Board's appellate arguments as they elucidate its rationale for its decision.

routinely employ such practices, such as the Mohegan Sun, which would manage Market East's casino, and which currently manages a Pennsylvania casino at Pocono Downs, as well as a casino in Connecticut that purportedly is the highest grossing casino in the Western Hemisphere with the largest database of customers. Finally, the Board points out that the Gaming Act contemplates some degree of economic concentration, and 58 Pa. Code § 421a.5(c) prohibits only "**undue** concentration of economic opportunities" which stifles competition, something it maintains Stadium's casino will not do. Board Brief (J-60-2015) at 28 (emphasis added).

Applying our circumscribed standard of review to this question, we discern no error of law, or arbitrary or capricious disregard of competent evidence, which would justify overturning the Board's decision on this basis. The Gaming Act, by its legislative design, does not, as a matter of law, regard multiple ownership interests in and of themselves as creating either a monopoly or undue economic concentration on the part of the possessor of such interests. Indeed, the Gaming Act specifically allows parties to possess multiple ownership interests, provided they do not exceed the statutory limits set by the legislature on such interests. See 4 Pa.C.S. §§ 1304, 1330.

Moreover, and importantly, neither 58 Pa. Code § 421a.5(c), nor the statute which this regulation was promulgated to effectuate, Section 1102(5) of the Gaming Act,[24] requires that the Board engage in an extended or in-depth discussion in a licensing adjudication of each separate factor that it considered in determining that an

---

[24] This statutory subsection provides:
> The authorization of limited gaming is intended to provide broad economic opportunities to the citizens of this Commonwealth and shall be implemented in such a manner as to prevent possible monopolization by establishing reasonable restrictions on the control of multiple licensed gaming facilities in this Commonwealth.

4 Pa.C.S. § 1102(5).

award of a slot machine license would not result in "undue concentration of economic opportunities" or "possible monopolization." Thus, the mere fact that the Board in this case did not engage in a formulaic, checklist style consideration of the criteria listed in 58 Pa. Code § 421a.5(c) in its Adjudication does not indicate that it failed to consider these criteria as part of its decision-making process. Indeed, it is evident from its Adjudication that the Board evaluated and judiciously weighed evidence regarding these factors in arriving at its decision, even though it did not formally announce that it was doing so. See Adjudication at 76-85; 118-120 (discussing physical capacity for gaming offerings currently offered by SugarHouse, the projected physical gaming capacity of Stadium, current revenues generated by SugarHouse, and the projected revenues for Stadium); 79-82 (detailing respective ownership structures of Parx Casino and Stadium); 113 (discussing geographical proximity of Stadium's proposed facility to existing casinos, and observing that it was far enough away from those facilities to create a "buffer" between them); 114-16 (discussing how the ownership structure of Stadium affected its ability to compete in the Philadelphia gaming market); 120, 122-23 (recognizing the effect of existing competition among casinos in the Philadelphia area for customers as undergirding Board's decision to select the "right sized" casino for the market, not the largest casino); 124 (analyzing the degree of "cannibalization" of revenues from all existing casinos by the opening of each of the proposed casinos); 126-28 (discussing how SugarHouse has "substantially benefited" from being the only Philadelphia area slot machine licensee to date, the legislature's considered judgment that Philadelphia was able to sustain two such facilities, the general market conditions extant in the Philadelphia gaming market at the time of the licensing proceedings, the effect of casino closures in nearby Atlantic City on customer demand, and how competition in the Philadelphia area gaming market would be enhanced by the opening

of a second casino); 155 (discussing the number of permanent casino jobs which each project would create). We, therefore, find no merit to this claim.

**2. Whether Stadium was ineligible to apply for a Category 2 license under Section 1304(a) of the Gaming Act because one of its owners could be considered an affiliate "eligible to apply" for a Category 1 license at the time of Stadium's application?**

In its next issue, Market East contends that Stadium was ineligible to apply for a Category 2 license under Section 1304(a) of the Gaming Act because one of its owners could be considered an affiliate "eligible to apply" for a Category 1 license at the time of Stadium's application. Market East argues that, under the plain language of Section 1304(a), if a person or entity, or any affiliate of the person or entity, is eligible to apply for a Category 1 license, then the person, entity or affiliate is, "*per se*," ineligible to apply for a Category 2 license. Market East assails what it considers the Board's disregard of this statutory restriction when it issued the Category 2 license to Stadium based on the Board's alleged failure to consider Manoukian's role in the ownership structures of both Stadium and Parx Casino. Market East claims that, at the time of Stadium's initial application, Stadium was ineligible to apply because Manoukian, as one of Stadium's "affiliates," was "eligible to apply" for a Category 1 license by virtue of his ownership interest in Parx Casino, through Greenwood — a Category 1 license holder. Market East contends that, even under Stadium's revised post-licensing structure, it was still ineligible to apply for the Category 2 license, since, in its view, Manoukian retained a controlling interest in Stadium, through what it regards as Manoukian's continuing control of Sterling Fiduciary.

Market East claims that Greenwood can be considered eligible to apply for a Category 1 license since it is a current Category 1 license holder and, thus, it had to have been eligible to apply for such a license in order to get it. Further, Market East

asserts that Greenwood continues to be eligible to apply since it is required under the Gaming Act to submit a renewal application for its Category 1 license every three years. Market East additionally assails what it considers to be the Board's overall failure to address the issue of the licensing requirements of Section 1304(a)(1) in its Adjudication, which omission it contends is reversible error. Market East Brief (J-60-2015) at 30.

The Board first responds that Market East's interpretation contravenes the purpose of Section 1304(a), as it has consistently interpreted that section since the Gaming Act was enacted. The Board notes that, under Section 1304(a), a holder of a Category 1 license is required to be a racetrack facility which conducts racing on a specified number of days during the year, and which otherwise maintains an active role in the racing business. The Board regards Section 1304(a)'s prohibitions against a Category 1 license holder also holding a Category 2 license as designed to ensure that the holder of a Category 1 license would not also be eligible to acquire a Category 2 license for the same racetrack facility, as this would enable the Category 1 license holder to operate a casino without having to continue to conduct live racing, thereby subverting one of the primary legislative goals of the Gaming Act — the enhancement of the sport of live horse racing in the Commonwealth.

The Board also observes that Section 1301 of the Gaming Act requires that all Category 1, 2, and 3 slot machine licenses be awarded "collectively and together in a comprehensive Statewide manner" within 12 months of the date set by the Board for the receipt of completed applications by the Board. Board Brief (J-60-2015) at 31 (citing 4 Pa.C.S. § 1301). The Board suggests that this legislative focus on expediting the approval process to get slot machine facilities operational as quickly as possible supports the conclusion that Section 1304(a)'s terms relating to the application process

refer to first-time applications for licenses after the Gaming Act took effect, not their subsequent renewal.

Further, the Board stresses that the plain language of the Gaming Act itself supports its interpretation. The Board notes that, when it conducted the initial licensing process contemplated by Section 1304(a) in 2006, Greenwood applied for, and was awarded, one of the six Category 1 licenses which were initially made available. The Board asserts that, once it acquired this license, Greenwood's status changed from that of an applicant to a license holder. As such, according to the Board, once Greenwood was awarded the Category 1 license for Parx Casino it was no longer eligible to apply for that license.

The Board rejects Market East's claim that, because a license holder must apply for renewal of a license every three years, the license holder can always be considered eligible to apply during the three year period covered by the license. The Board contends that this would create an absurd result where a Category 1 license holder would be considered eligible to apply during the three-year period that his or her license is active, and would only be out of "eligible to apply" status for the period of time his or her renewal application is pending before the Board. Consequently, the Board considers Greenwood, at the time of Stadium's application, to have been a Category 1 license holder, which was no longer eligible to apply for a Category 1 license. The Board considers Market East's arguments regarding the ownership structure of Stadium to be irrelevant to our interpretation of the requirements of Section 1304(a) and, instead, more salient to the question of whether the requirements of Section 1330 were met.

Since our review of the Board's interpretation of Section 1304(a) involves a question of law, our review is *de novo*. Mason-Dixon Resorts, LP v. Pennsylvania

Gaming Control Board, 52 A.3d 1087, 1093 (Pa. 2012).  Section 1304(a) of the Gaming Act provides:

> **(a) Eligibility.—**
>
> (1) **A person may be eligible to apply for a Category 2 license if the applicant, its affiliate, intermediary, subsidiary or holding company is not otherwise eligible to apply for a Category 1 license** and the person is seeking to locate a licensed facility in a city of the first class, a city of the second class or a revenue- or tourism-enhanced location. It shall not be a condition of eligibility to apply for a Category 2 license to obtain a license from either the State Horse Racing Commission or the State Harness Racing Commission to conduct thoroughbred or harness race meetings respectively with pari-mutuel wagering.

4 Pa.C.S. § 1304 (emphasis added).  In interpreting a provision of the Gaming Act we are guided by the principles embodied in our Statutory Construction Act.  Pennsylvania Gaming Control Bd. v. City Council of Philadelphia, 928 A.2d 1255, 1263 (Pa. 2007). The principally relevant provisions of the Statutory Construction Act applicable to this matter are: Section 1921(a), which specifies that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly", and that "[e]very statute shall be construed, if possible, to give effect to all its provisions," 1 Pa.C.S. § 1921(a); and Section 1921(b), which instructs:  "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit,"  id. § 1921(b).

The Statutory Construction Act also sets forth certain presumptions regarding the General Assembly's enactment of statutes which guide our interpretation in this instance, particularly that: "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage," 1 Pa.C.S. § 1903(a); the legislature "does not intend a result that is absurd, impossible of execution or unreasonable," 1 Pa.C.S. § 1922(1); and the legislature intends the entirety of the

statute to be certain, 1 Pa.C.S. § 1922(2). Additionally, if the General Assembly defines words that are used in a statute, those definitions are binding. Young's Sales and Service v. Underground Storage Tank Indemnification Board, 70 A.3d 795, 801 (Pa. 2013).

We note also that, when interpreting a statute, which has already been interpreted by an administrative agency tasked by the General Assembly with enforcing it, we accord deference to the agency's interpretation if the statute is ambiguous. Seeton v. Pennsylvania Game Commission, 937 A.2d 1028, 1037 (Pa. 2007). However, by contrast, if the statutory language is unambiguous, or the agency's interpretation has been developed in anticipation of litigation, then deference is not required, and our Court treats the question of interpretation as purely a matter of law. Malt Beverages Distributors Association v. Pa. Liquor Control Board, 974 A.2d 1144, 1154 (Pa. 2009).

Applying these principles to Section 1304(a) of the Gaming Act, and giving the terms of Section 1304(a) their ordinary and accepted meaning, a "person" is eligible to apply for a Category 2 license if it, as "the applicant" (or "its affiliate, intermediary, subsidiary, or holding company"), is "not otherwise eligible to apply for a Category 1 license." 4 Pa.C.S. § 1304(a). Utilizing the definitions for these terms set forth in the Gaming Act, we first conclude that Stadium, as a limited liability corporation, is a "person" as that term is used in this section. See 4 Pa.C.S. § 1103 (defining "person" as "[a]ny natural person, corporation, foundation, organization, business trust, estate, limited liability company, licensed corporation, trust, partnership, limited liability partnership, association or any other form of legal business entity"). Thus, in order for Stadium to have been eligible "to apply for" the Category 2 license with the Board — i.e., to commence the application process with the Board — at the time of its

application, neither it, nor "its affiliate, intermediary, subsidiary or holding company," could be "otherwise eligible to apply for a Category 1 license." As the parties seemingly agree, Manoukian qualifies as an "affiliate" of Stadium since Stadium is under the "common control" of Manoukian and other persons through intermediate business entities.[25] See 4 Pa.C.S. § 1103 (defining "affiliate" as "[a] person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with a specified person."). The dispositive question, then, as to whether Stadium was eligible to apply for a Category 2 license under Section 1304(a) is, as contested by the parties, whether Manoukian was "otherwise eligible to apply for a Category 1 license" at the time Stadium was applying for its Category 2 license.[26]

We agree with the Board that, generally, the Gaming Act differentiates between the legal requirements a person must meet when first applying for a slot machine license for a particular facility, and for the renewal of said license. See 4 Pa.C.S. § 1325(a) (governing issuance of slot machine licenses); Id. § 1326(a) (governing renewal of such licenses). This lends support to the Board's contention that, once an initial applicant for a Category 1 license for a particular facility is successful, the application process has come to an end, and the applicant is, thereafter, a license holder for that facility subject to the Act's license renewal requirements. See 4 Pa.C.S. § 1103 (defining "applicant" as "[a]ny person who, on his own behalf or on behalf of another, is applying for permission to engage in any act or activity which is regulated under the provisions of this part."). Thus, we reject Market East's assertion that a person seeking renewal of an already-issued Category 1 gaming license must be regarded as "applying for" that license. However, Sections 1325 and 1326 are not

---

[25] In this regard, we do not interpret the term "common control" to mean sole or majority control, as Section 1103 separately utilizes the terms "controls" and "common control."
[26] In this context, we construe "otherwise" to mean "additionally."

dispositive of this question, as they do not establish the criteria which make a person "**eligible to apply for** a Category 1 license."

These criteria are, instead, established by Section 1302(a) of the Act which provides "[a] person may be eligible to apply for a Category 1 license to place and operate slot machines at a licensed racetrack facility" if the person meets any of four criteria set forth therein regarding that facility's licensure for the conduct of live racing and wagering thereon. 4 Pa.C.S. § 1302. While Section 1302 prohibits the issuance of more than one slot machine license for a particular licensed racetrack facility, it does not, on its face, prohibit a Category 1 license holder such as Manoukian from being eligible to apply for **another** Category 1 license for a separate racetrack facility. We conclude that, so long as a person holding a Category 1 license for one facility meets the criteria set forth in Section 1302 with respect to another facility, the person continues to be "eligible to apply for a Category 1 license" for the other facility.[27] We cannot determine from this record, however, whether Manoukian was "eligible to apply for a Category 1 license" for another facility at the time Stadium filed its application for the Category 2 license, since, as Market East points out, the Board failed to address the issue of the licensing requirements of Section 1304(a)(1) in its Adjudication. As resolution of this question requires additional findings of fact by the Board, and as our Court does not engage in fact-finding in the first instance, we must remand to the Board for further proceedings on this issue. See Greenwood Gaming, supra (remanding to the Board for it to consider factual issue not addressed in licensing proceeding).

**3. Whether Stadium was precluded from holding a Category 2 license under Section 1330 of the Gaming Act because an individual holding an ownership**

---

[27] To be **issued** the license, such an applicant must, of course, also meet the requirements of Section 1303 and not be otherwise barred by the provisions of Section 1330.

**interest in Stadium allegedly possessed a greater than 33.3 percent ownership interest in a racetrack/casino that is a Category 1 licensed facility?**

Market East next argues that the Board, in granting the license to Stadium, violated Section 1330 of the Gaming Act because an individual holding an ownership interest in Stadium possessed a greater than 33.3% ownership interest in a racetrack/casino that is a Category 1 licensed facility.[28]  Market East argues that the Board engaged in only a "cursory" analysis of the issue of Stadium's compliance with Section 1330, and did no "in-depth analysis on this point" in its Adjudication, despite the putative existence of myriad "red flags" in the evidentiary record pertaining to this question. Market East Brief (J-60-2015) at 31-32.  Market East reminds that, during the licensing process, the Bureau of Investigation and Enforcement and the Board itself had serious concerns about whether Manoukian's interests in both Greenwood and Stadium violated Section 1330, and that Stadium specifically developed and entered into the record its proposed post-licensing structure as a deliberate "work around," to ensure that the equity interests of Manoukian would be within the statutorily mandated proportions after the license was granted.  Id. at 36.

With respect to Stadium's proposed post-licensing structure, as it pertains to ownership of the corporate trustee, Sterling Fiduciary, Market East argues that Manoukian did not relinquish any actual ownership or control of this corporation, but rather, ceded only what it terms "paper power" over this entity, due to the fact that, when Manoukian resigned his position as president and treasurer of Sterling Fiduciary, a long-time business associate of his was installed in those positions, and other family

---

[28] The Board argues this issue is waived due to Market East's failure to raise the issue before the Board.  Board Brief (J-60-2015) at 39 n.17.  However, we reject this claim for the same reasons we rejected the Board's similar claim that Market East's first issue was waived.  See supra Part II.B.1.

members continue to be shareholders in Sterling Fiduciary. Market East Brief at 35. Market East contends that these factors, as well as certain financial transactions and arrangements made by Manoukian, the full details of which are outlined in the sealed record in this matter, collectively establish that these transfers were a "sham," as Manoukian yielded no actual ownership or control of Sterling Fiduciary. Market East claims that the nature of these transactions raises a legitimate presumption that Manoukian continues to hold the controlling interest in Sterling Fiduciary and that this arrangement contravenes Section 1330. Market East decries the Board's failure to address these matters in its Adjudication, as well as its lack of discussion as to whether its consideration of Stadium's post-licensing structure was appropriate under the Act. It contends that the Board committed an error of law through its failure to engage in any reasoned legal analysis of these questions.[29]

The Board responds that, under the plain language of Section 1330, the relevant ownership structure that must be considered is that which existed at the time the license was issued; hence, the Board contends that it properly considered the revised ownership structure, which Stadium submitted after the record was re-opened. The Board points out there is nothing in either the text of the Gaming Act or its own regulations which prohibits its consideration of that structure.

The Board further asserts that, because the corporate documents pertaining to the formation of the corporate trustee — Sterling Fiduciary — show that it is controlled by a board of directors that Manoukian does not sit on, he has no control over its decisions. Thus, the Board considers the assets, which Sterling Fiduciary possesses in the capacity of trustee, to be held for the benefit of others, and, thus, that Sterling

---

[29] *Amicus* Chester Downs aligns with Market East's contention that Stadium's ownership structure violates Section 1330.

Fiduciary cannot be regarded as either owning or having a financial interest in those assets. Hence, the Board reiterates its contention, advanced in its Adjudication, that none of the assets Sterling Fiduciary holds in the Sterling Investors Trust can be considered to be owned by Manoukian and, thus, that the only share of Stadium properly attributed to Manoukian is derived from his ownership interest in Greenwood multiplied by Greenwood's ownership interest in Stadium — yielding a total ownership interest of 28%. The Board maintains that, even if Manoukian somehow controlled Sterling Fiduciary, that control would be irrelevant for purposes of a Section 1330 analysis, since that section only establishes restrictions on a slot machine licensee's possession of an "ownership" or "financial interest" in another slot machine licensee, but does not contain any prohibitions on the licensee's ability to control another licensee.

The relevant portion of Section 1330 provides:

> No slot machine licensee, its affiliate, intermediary, subsidiary or holding company may possess an ownership or financial interest that is greater than 33.3% of another slot machine licensee or person eligible to apply for a Category 1 license, its affiliate, intermediary, subsidiary or holding company. The board shall approve the terms and conditions of any divestiture under this section.
>
> * * *
>
> No such slot machine license applicant shall be issued a slot machine license until the applicant has completely divested its ownership or financial interest that is in excess of 33.3% in another slot machine licensee or person eligible to apply for a Category 1 license, its affiliate, intermediary, subsidiary or holding company.

4 Pa.C.S. § 1330.

Considering the plain meaning of the language of this provision, we agree with the Board that these restrictions on ownership and financial interest are applicable only after a slot machine applicant has been issued a license by the Board and becomes a "licensee." Indeed, the language of Section 1330 specifically allows an applicant to

divest itself of any ownership or financial interest in another licensee during the licensing process in order to be under the 33.3% limit. Hence, we discern no error in the Board's consideration, during the process of making its licensure decision, of the ownership structure which Stadium proposed to have if issued a license.

However, that does not end the matter. Section 1330, by its terms, prohibits a slot machine licensee, or its affiliate, intermediary, subsidiary, or holding company from possessing "an ownership or financial interest that is greater than 33.3%" in another slot machine licensee, or its affiliate, intermediary, subsidiary, or holding company. 4 Pa.C.S. § 1330. Consequently, the Board is required by Section 1330 to examine the percentage of both the ownership **and the financial interest**[30] that an existing license holder will possess in a licensee after the license is issued. Notably, the Board considered only the percentage ownership interest which Manoukian would have in Stadium, post licensure, through his ownership interest in Sterling Fiduciary; however, it did not discuss at all in its Adjudication the financial interest, if any, which Manoukian may have after the restructuring in Sterling Fiduciary, the Sterling Investors Trust, and, ultimately by extension, in Stadium due to certain financial transactions and commitments of financial support he made during the application process referenced — the details of which are part of the sealed confidential record in this matter — or through any other financial transaction. As this factual determination of Manoukian's financial interest in Stadium post-licensure is necessary to ascertain whether Stadium's post-licensing structure ran afoul of Section 1330, and since it is not our role to make such a

---

[30] The Gaming Act itself does not define the term "financial interest" as it is used in Section 1330, but this term has been defined by the Board in the regulations it promulgated pursuant to the Act. See, e.g., 58 Pa. Code § 403a.1 (defining "financial interest" as "[a]n ownership, property, leasehold or other beneficial interest in an entity"). Thus, on remand, we leave to the Board to determine in the first instance the applicable definition of "financial interest" as that term is used in Section 1330.

determination in the first instance, we must remand to the Board for further proceedings with respect to this question.

**4. Whether the Board arbitrarily and capriciously disregarded the evidence of record in awarding the Category 2 license to Stadium?**

In its final issue, Market East contends that the Board arbitrarily and capriciously disregarded the record evidence in awarding the Category 2 license to Stadium. In its brief, Market East marshals the evidence it presented to the Board in support of its application, and proffers that, because the Board allegedly arbitrarily and capriciously disregarded this evidence when it decided to award the Category 2 license to Stadium, we should overturn its decision. However, as we have stated previously, "the Act does not grant us authority to act as a super-Board, employing our own discretion in determining which applicant we believe was the best applicant. We are not empowered to sift through the voluminous evidence, reweighing it." Mason-Dixon Resorts, 52 A.3d at 1107 (internal quotation marks omitted). Applying this highly deferential standard of review, we conclude that the Board did not abuse its discretion in awarding the license to Stadium based on the myriad factors it outlined in its Adjudication and which we have discussed, supra, at pages 10-11.

### III. Conclusion.

For the foregoing reasons, the order of the Board must be affirmed in part, vacated in part, and the matter remanded for further proceedings, per the attached Order. Because the Order of necessity discusses matters contained in the sealed record, the public version of the Order is partially redacted.[31]

---

[31] SugarHouse has filed an "Application for Leave to File Post-Submission Communication," renewing its request for oral argument which our Court previously denied. While we grant the application to file the post-submission communication, we deny the request for oral argument.

Chief Justice Saylor and Justices Baer, Donohue, Dougherty and Wecht join the opinion.

Justice Wecht files a concurring opinion.